# WASHINGTON HERALD COMPANY *v.* BERRY.

---

ARREST OF JUDGMENT; PLEADING; LIBEL AND SLANDER; APPEAL AND ERROR; TRIAL; EVIDENCE; PRIVILEGE; NEWSPAPERS; DAMAGES, COMPENSATORY AND PUNITIVE.

1. A liberal construction is given the pleadings upon motion in arrest of judgment on a verdict in favor of the plaintiff in an action for libel,

the plaintiff being given the benefit of every implication that can be drawn in his favor; and to that end sentences and paragraphs may be transposed and allegations in one part of the complaint aided by those of another, and if, taken together, they show the existence of facts constituting a good cause of action, defectively set forth or improperly arranged, the motion in arrest of judgment will be denied. (Citing *Rudd* v. *Buxton, post*, 353.)

2. Permitting the plaintiff in an action of libel to read in evidence the entire article of which only a part is set out in the declaration is not reversible error, although the parts not set out are not libelous and do not affect those set out, especially where the defendant sets out the entire article by plea.

3. Refusing to let the defendant in an action of libel read in evidence related articles published in its newspaper, which were not complained of, is not reversible error, where the plaintiff read them in evidence in proving his own case.

4. The fact that other newspapers published articles relating to the subject-matter of that published by the defendant does not, whether they were libelous or not, afford any justification for the defendant's publication.

5. No privilege attaches to a libelous newspaper article published concerning a private person who, having resigned from public office, is engaged in a public controversy with his former chief.

6. A newspaper has no privilege peculiar to itself in the publication of libelous articles in a matter of public concern. (Citing *Russell* v. *Washington Post Co.* 31 App. D. C. 277, 14 Ann. Cas. 820.)

7. Requested instructions are properly refused when not presented in writing as required by the 3d section of rule 44 of the Common Law Rules of the Supreme Court of the District of Columbia.

8. A publication tending to bring a person into contempt, ridicule, and disgrace is libelous *per se*, and it is not necessary that a criminal offense be charged. (Citing *Bailey* v. *Holland,* 7 App. D. C. 184; *Washington Gaslight Co.* v. *Lansden,* 9 App. D. C. 508; *Washington Times Co.* v. *Downey,* 26 App. D. C. 258, 6 Ann. Cas. 765; and *Russell* v. *Washington Post Co.* 31 App. D. C. 277, 14 Ann. Cas. 820.)

9. The question of the actionability of alleged libelous language is for the jury, where it is not libelous *per se*, but, in the light of extrinsic facts, is susceptible of a construction which will give it a defamatory meaning.

10. A newspaper publication concerning a former public officer, which states that he is "a disgruntled fanatic," was deposed from office, and got off easy when deposed and nothing more, while not libelous *per se*, is susceptible of a meaning that would hold him up to public

contempt and ridicule, and it is not error for the trial court to leave it to the jury to find whether the public would so understand the language.

11. A charge submitting the question of the defamatory character of a publication which is not libelous *per se*, to the determination of the jury as a fact, may be prefaced with the statement that it is, as a matter of law, susceptible of a libelous construction.

12. Where in an action of libel for the newspaper publication of charges against the plaintiff, the defendant does not plead the truth of the charges, it is not error for the trial court to charge the jury that they may assume that none of the charges was true. (Following *Pickford* v. *Talbott*, 28 App. D. C. 498.)

13. The compensatory damages to be awarded for the publication of a libelous article in a newspaper are to be fixed by regarding the nature of the article, the circulation of the paper, and the distress and humiliation suffered by the plaintiff, and considering what is a fair financial equivalent of the detraction from his reputation in the community. (Citing *Washington Times Co.* v. *Downey*, 26 App. D. C. 258, 6 Ann. Cas. 765.)

14. Punitive damages may be awarded for the publication of a libelous article with a wilful or reckless disregard of plaintiff's rights, though without personal hostility. (Citing *Bailey* v. *Holland*, 7 App. D. C. 184.)

No. 2561.   Submitted December 3, 1913.   Decided January 5, 1914.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia on verdict for the plaintiff, in an action brought to recover damages caused by the publication of a libel.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

James Berry brought this action in the supreme court of the District against the Washington Herald Company for damages caused by the publication of a libel in the Washington Herald, on July 23, 1911, and recovered judgment for $3,000, from which this appeal has been prosecuted.

The declaration is in ordinary form, and sets out the following as the publication complained of, with the meaning thereof:

Weather Bureau Chief Hits Hard at His Accuser. Declares
Berry is a Disgruntled Fanatic—Says He Was
Satisfied Until He Lost His Job.

That the charges against the workings of the United States Weather Bureau by James Berry (meaning the plaintiff), a former employee, is a "tempest in a teapot," and that Berry is a "disgruntled fanatic, deposed for good and sufficient reasons from the office of Chief of the Division of Distribution," were the opinions expressed by Prof. Willis L. Moore, Chief of the Weather Bureau, yesterday.

Professor Moore said that on account of "this being a period of hysteria for investigations," Mr. Berry (meaning the plaintiff) has taken the opportunity to satisfy an ancient grudge against his former chief, and is trying to make a matter of "personal revenge and hatred" one of official investigation.

According to Professor Moore's statement, Mr. Berry (meaning the plaintiff) had no fault to find with the Weather Bureau until he had lost his job, and the weather chief indicated that Berry (meaning the plaintiff) was getting off easy when he (meaning the plaintiff) was simply deposed, and nothing more was said concerning the manner in which he had filled the office of chief of his division.

"You cannot make my denunciation of Mr. Berry (meaning the plaintiff) too strong," said Prof. Moore, yesterday. "I believe Mr. Berry has consecrated his life to the work of my personal undoing."

Meaning thereby and intending to convey, and actually conveying, that the said plaintiff in respect of his personal character, reputation, and condition, and in respect of his character, reputation, and ability in his conduct of the office aforesaid, was grossly deficient, unskilful, dishonest, corrupt, untruthful, untrustworthy, and otherwise disreputable, and was dishonorably dismissed from the office of Chief of the Distributing Division by reason of such conduct.

The damages claimed are general for injuries to plaintiff's good name and reputation in that the publication was intended to and did convey the meaning that plaintiff had been dismissed from office for incompetency and dishonesty, and that he was untruthful and disreputable, and was contrived to hold him up to ridicule and contempt, and to disgrace him.

In addition to the general issue, defendant filed a special plea, alleging that, before the publication of the article complained of, plaintiff had laid before Congress and the Attorney General of the United States certain charges relating to the official conduct of Willis L. Moore, Chief of the Weather Bureau, and had sought newspaper publicity concerning the same, thereby making the same matter of public interest to the readers of the Herald. That the defendant on July 21, 1911, published in the Herald an article headed, "Weather Bureau under Charges." The article is set out in full. It states, in substance, that Moore, Chief of the Weather Bureau, had been charged with unlawful expenditure of money for the employment of experts. That James Berry yesterday filed charges with the Department of Justice of unlawful expenditure in connection with seismographical observations made by Rev. F. L. Odenback at Cleveland, Ohio. That Berry declares this unlawful because there is no provision therefor in the appropriation for the Bureau. That an attempt was made to conceal the facts in the case; that Secretary Wilson refused to discuss the case; and that it was learned that the Attorney General made no recommendation concerning the charges before sending them to Secretary Wilson. That Berry resigned from the Bureau some time ago.

It further set out a publication in the Evening Star of July 21, 1911, headed "Berry's Charges to be Investigated." This reported a statement by the chairman of the House committee that the committee would at an early date consider the charge of Berry against Moore of unlawful expenditure of money in the employment of experts. That Berry had filed charges against the administration of the Bureau relating to the employment of Rev. Odenback. That the chairman did not know that any payments had been actually made to Rev. Odenback;

and that the committee would look into this when it had the time.

That on July 22, 1911, the Herald published, as matter of current news, an article headed, "Experts in the Weather Bureau," which is set out in full. The article contains a brief statement of the charges recited in the article of July 21.

That on the afternoon of July 22, 1911, the Washington Times published an article concerning said charges, consisting almost wholly of voluntary statements made for publication by plaintiff.

The article is headed "Berry Declares he will Continue his War on Moore:   Makes Explanation that he is not Fighting Weather Bureau."

The article begins with statements purporting to have been made by plaintiff, in which he says it is a mistake that he is fighting the Bureau; that he is fighting Moore only.   That he made his charges before leaving the Bureau; had resigned to save his self-respect; that previous thereto he had opposed the policies of the Bureau because he thought they were wrong. That as to the charge that Moore had tried to engage the services of Father Odenback, despite the fact that Congress had refused to make an appropriation for seismographical work, Moore first made overtures to Father Odenback, and when rejected sent Charles F. Marvin to him to induce him to reconsider.   A letter of Father Odenback to plaintiff is published in which he states that seismography has nothing to do with meteorology.   That Berry was not discharged or displaced; while he was on leave of absence, the Disbursing Division, of which he was chief, had been abolished for the purpose of getting rid of him, while the offer to make him observer at Atlantic City was made merely to to get him gracefully out of the District.   That he declined the offer and resigned August 10.   Also said: "The time had arrived when I must choose between important personal interests and my self-respect," as stated in his letter of resignation to the Secretary of Agriculture.   That Berry said he and Moore had an interview September 9, and that Moore had a stenographer concealed in the room.   That Moore said he had probably made

a mistake in his estimate of Berry's mental and physical condition, and asked whether he could conduct the affairs of the Climatological Division. Berry's reply was in the affirmative, but that certain disagreeable conditions to which he had been subjected must cease. Moore went immediately to the Department, and secured the prompt acceptance of the resignation.

The article then proceeds to refer to a pamphlet issued by Berry, detailing his services in the Bureau since 1878. It then proceeds to give a statement by Moore that he has never paid Father Odenback anything; offered to do so, but he declined. It was in accordance with law to make the offer to pay him, and, had he accepted the proposition, would have paid him.

Then follows a statement by the House committee chairman, that his committee would consider the charges of Berry. A further statement was to the effect that Father Odenback had denied receiving money for observations.

That on the same afternoon, the Evening Star published the following statement signed by plaintiff:

To the Editor of the Star:

No charge has been made by me that Willis L. Moore has paid from government funds for seismological work. My charge is that without requisite authority, which he sought and failed to obtain, he offered to pay for services in that connection. That public money was not actually paid is because the offer was refused despite the earnest solicitations of Mr. Moore and his subordinates.

In regard to Mr. Moore's published denial of the necessity for authority for this work it may be stated that in the Year Book of the Department of Agriculture, 1910, just issued (the proof of which was doubtless read subsequent to the committee hearing), page 41, is the statement:

"It appears proper at this point to renew a former recommendation that Congress be requested to authorize and provide for seismological work, and place it under control of the weather bureau."

Mr. Moore, as late as the first week in June, 1911, despatched

at government expense a subordinate to Cleveland to induce Father Odenback to contradict a statement which I attributed to the latter in a circular issued May 28, 1911, showing that Mr. Moore had made the unlawful proposition to Father Odenback.                                        James Berry.

That after the aforesaid publications had been made, the said Moore gave the defendant a statement by said Moore, which, together with certain oral statements by him, was published in the Herald July 23, 1911. The article is set out in full, and contains the part set out in the declaration.

That in publishing the same, defendant believed that said Moore had the right to utter and publish said statement, and that the same was matter of public news in which the readers of the paper had an interest; and that the same was a just, true, and fair answer to the statements of plaintiff and comment upon his utterances. That the publication was made without malice, and in perfect good faith, etc.

Plaintiff offered evidence tending to show that he had been in the service of the Bureau for thirty-two years, had been promoted from time to time for efficient service, and finally attained the position of Chief of the Distributing Division. That in July, 1910, he was at Atlantic City, on leave of absence. That there he received information from Moore that there was to be a reorganization, and tendering him the position of observer at Atlantic City, which he had declined. That he resigned his position on August 10, 1910. Had made no charges against Moore prior thereto. Had had differences with him concerning work and the policy relating thereto. In his letter of resignation he stated to the Secretary that he had information concerning one of his subordinates, and that he was resigning because of something improper in the conduct of the Bureau, and could not maintain his self-respect and remain therein while certain conditions existed. That he made charges to the President December 10, 1910; to Congress March or April, 1911, and to the Attorney General on July 14, 1911.

That the Herald had a circulation of about 30,000 copies in

the District of Columbia and the United States, and had published the article, extracts from which are set out in the declaration, and offered to read the whole article.

Defendant objected because the complete article had not been declared upon. The objection was overruled, and defendant excepted. Plaintiff read in evidence the article of July 21, 1911, from the Herald, and also the article of July 22, 1911, both of which are contained in defendant's plea. He then read an article published in the Herald July 24, 1911, under the caption, "Was not Dismissed from Bureau. Mr. Berry Says he Tendered Resignation Voluntarily." The article follows the caption, and states that Moore made unsuccessful efforts to have him withdraw his resignation. The other portion asks Moore to explain why he so persistently follows up his requests to Congress to take up seismology in the work of the Bureau, and asserts that employees were sent to Father Odenback to induce him to deny the statements made by plaintiff in a circular issued by him May 28, 1911. That both trips were made under the guise of official business and at government expense, as the records will show, and that plaintiff had called the attention of the Auditor to the questionable propriety of these trips as official business. No objection was offered to the reading of the foregoing articles.

He further testified that he was then a subscriber to the Herald, and had read both articles of July 21 and July 23, 1911. No one representing the Herald interviewed him in regard to either of said articles. There is nothing true in the article of July 21, except that plaintiff had resigned. All other statements are false. That the statement attributed to him that Father Odenback had received money from the government is absolutely false. That he went to the Herald office on July 23, 1911, and demanded a retraction, which was not made. Defendant objected to this evidence demanding a retraction, and the conclusion that it had not been made. Objection overruled, and exception noted. Plaintiff then stated that he went to the Herald office in the forenoon of the day of publication of the article complained of. Saw one of the editorial staff, who said

he had no authority, and advised him to come in after noon and see Mr. West. Saw Mr. West in the afternoon, and presented a statement for publication, which was received, and some of it was published. This ended his relations with the Herald. In reply to a question in regard to the statement in the article whether he had borne an ancient grudge, or had consecrated his life work to the Bureau Chief's undoing, he said: "They are groundless. I was the author of charges against his administration, that I was pressing, but personally I had no grudge against him. I criticized his official actions, and had been endeavoring to gain a congressional investigation of the conduct of his office."

Cross-examined, he said that he had had differences with Moore concerning the administration of important work under his charge and the policy regarding it, and no personal differences. Remembers that he was interviewed by a representative of the Times, and the article published was "somewhat of a garbled report." Plaintiff read the report of the Department of Agriculture of October 11, 1910, showing acceptance of his resignation as follows: "James Berry, Washington, D. C. Chief of Distributing Division, Resigned; record good." At the close of plaintiff's evidence, defendant moved for the direction of a verdict on the grounds that the article complained of is not libelous *per se*. and no special damages had been alleged or proved; that in the declaration there is no introduction of any extrinsic facts which would give the alleged libelous article any meaning different from its ordinary meaning; that there is nothing in the article sustaining the innuendo, or tending to show that the words quoted mean that plaintiff had been either deficient, unskilful, dishonest, corrupt, or untrustworthy; that the words were not published of the calling or business of plaintiff; that they did not charge the commission of a crime, and because there is nothing in the declaration to sustain the innuendo. The motion was denied, and exception reserved.

Defendant then offered to read in evidence so much of the third plea as recited the article of July 21, 1911. The court, holding that under the replication the plea was not admitted to

be true, and that the matter was irrelevant, excluded the evidence, with exception noted. Defendant next offered the article appearing in the Evening Star, as recited in its plea, of July 21, 1911. The court excluded it as irrelevant, and his ruling was excepted to. Like offers were made of the articles from the Times and from the Star of July 22, 1911, with like ruling and exceptions. Plaintiff then read letter of Moore to plaintiff dated July 28, 1910, stating that, owing to death and resignation of certain employees, a reorganization was intended; that plaintiff was not in mental or physical condition to carry the burden of the chiefship of one of the larger divisions that it is the purpose to create; that plaintiff's services in the past were those of an efficient administrator and adviser; that it would be better for plaintiff and the service if he were to accept some position outside of Washington, the duties of which would be less exacting than if he were to remain at the head of one of the new divisions; and offering him the charge of Atlantic City, with a salary of $1,800. A telegram in reply thereto of same date by plaintiff, saying, to ignore his personal interest in reorganization, and that he objected to the displacement of an official known to be anxious to remain at Atlantic City; that was his chief objection. Orders were read, dated August 1, 1910, abolishing the Distributing Division, and assigning its work to certain other divisions; order to take effect August 15.

Several letters and telegrams were read, which relate to the new assignment, and are unimportant. A letter of Moore as Chief of Bureau, of August 4, announced suspension of the assignment to Atlantic City, and extension of date to September 15 for abolition of the Distributing Division. Plaintiff replied August 5, stating it would be impossible for him to leave Washington, and referring to Moore's unsolicited testimonials as to his efficiency and valuable experience, and to the record of his office attendance as evidence of his physical condition. Other correspondence comprised plaintiff's resignation and its acceptance.

Francis P. Dailey testified that since August, 1911, he had been city editor of the Herald. That he was assistant to the

WASHINGTON HERALD CO. v. BERRY.

D. C.]                    Statement of the Case.

city editor on July 23, 1911, and was acting in the place of his principal. Did not receive the article; probably looked over it, and saw the proof sheets. ⟨ Knew that charges and counter charges had been published. Mr. West, the editor, was final judge of what should be printed. Did not see plaintiff before the publication; had no malice or feeling against him. Did not see Mr. Moore. The article came to the office through a reporter. Custom of papers as to publishing both sides of a controversy is, "We always get the other man's side." Was familiar with the article in the Times of July 22. Plaintiff came to the office on the 23d, and said he wanted a retraction; told him to take it up with Mr. West, and invited him to give the paper a statement for publication. Did not see plaintiff on his return, but Mr. West handed in the article published July 24, under the caption, "Was not Dismissed from the Bureau."

This article was then read. Witness's desire was to publish as full a statement as possible. Cross-examined, he said he did not know whence the information for the article of July 21 came. Berry did not give it to witness. Statement of Berry's charges were obtained from the Department of Justice. No attempt was made to see plaintiff and learn the truth of the charges in the article of the 23d, because they had his charges and asked Moore what he had to say. Somebody on the copy desk wrote the head lines; witness did not see them, as they were not on the proof sheets. When he saw the proof he said it was "a good story." The article was published also because it was from a public official. Had nothing to do with getting the story. Thinks that the proof sheets came back from Mr. West. None of them were unfriendly to plaintiff. It was a public matter. Another witness, an employee of the Star, testified to his newspaper experience, and considered such articles of public interest; that interest would be limited by a possible fear of libel. "No newspaper office knows very distinctly what libel is." Cross-examined, he said that if a newspaper should print false statements of one in private life, without first interviewing him,

it would commit libel. Defendant renewed its motion for a verdict, and excepted to its denial.

Defendant asked the court to instruct the jury that if they believe the facts set up in the second and third pleas, they cannot find for the plaintiff; and that unless they believe that plaintiff has proved that the defendant printed the alleged libelous article with knowledge of its falsity, they must find for it. The court stated that unless these requests were submitted in writing, as required by the rules of the supreme court of the District, they would not be considered. They were not reduced to writing, and defendant excepted.

Almost the entire charge of the court must be recited because of the exceptions to it. The part to which the exceptions relate is the following:

"You may take it for granted that the majority of this article the newspaper had a right to publish; but there are certain phrases which it did not have the right to publish, and I am going to read those particular phrases to you, and then show you the considerations which will determine whether or not they are libelous. As to the determination of the case upon the question whether there is a liability, you can take it the defendant had a right to publish everything in that article except what I read to you, for these things they did not have a right to publish. First from the headlines of the article, 'Weather Bureau Chief Hits Hard at His Accuser. Declares Berry is a Disgruntled Fanatic—Says he was Satisfied Until he Lost his Job.' Then from the body of the article, 'and that Berry is a disgruntled fanatic, deposed for good and sufficient reasons from the office of Chief of the Division of Distribution.' Further, 'and the weather chief indicated that Berry was getting off easy when he was simply deposed, and nothing more was said concerning the manner in which he had filled the office of chief of his division.'

"Those three clauses the defendant did not have a right to publish against this plaintiff. Whether or not the publication of that matter amounts to an actionable libel depends on whether, in your judgment, the phraseology that I have read—all or

any part of it—held this plaintiff up to public ridicule, disgrace, contempt, or hatred. If it did, the language is libelous, and he is entitled to recover damages for its use.

"The court must hold, and the court has ruled, that, as a matter of law, the language is susceptible of meaning which would hold the plaintiff up to public contempt, ridicule, disgrace, or hatred. It is for you to say, as a matter of fact, whether the general reading public would interpret that language as they read this article in connection with the context published. and it is for you to decide as a matter of fact, whether the general reading public, as it reads the newspapers, would regard that language as holding this plaintiff up to public ridicule. disgrace, contempt, or hatred. If that is the way the article would impress, in this particular phraseology of it, the general public, then that is the meaning you ought to assign to it.

"It is not necessary in order for the plaintiff to make out a cause of action against the defendant, that the language should charge him with dishonesty, with criminality, or with any of the other particular details that are mentioned in the petition. It is, however, necessary, and only necessary, that the language should hold him up to public ridicule, contempt, disgrace, or hatred, and that is what you have to decide in determining what significance ought to be given this particular phraseology which I have read to you from the petition, and which I have marked for your convenience; taking that into connection with all the balance of what is said in the article. If you find that that is the significance which the public would attach to it, then, as I have said, the plaintiff makes out his cause of action for damages. If that is not the significance to be attached to the language, then there has been no defamation, and your verdict ought to be for the defendant.

"If you find that the language I have read to you does hold him up to public ridicule, contempt, disgrace, or hatred, you are not concerned with whether any of these are true; that has nothing to do with this case. You can assume that none of them are true, for the purpose of this case; and if you find that

the article is libelous, as I have said, he establishes his right to compensatory damages without any further proof, because in actions for the defamation of one's good name and reputation it is utterly impossible and impracticable for one whose name has been injured to bring evidence before the jury to show them in detail how he has been injured, because a man cannot tell how far the imputation will reach, nor where it will ramify, and the law does not require him to. That is a question which the law submits to the good judgment of the jury without proof on the point. It is for you to say how much you think in the way of financial damage the particular plaintiff has sustained by the nature of the article, the number of the issue of the newspaper, and the general extent to which the publication was in circula- tion. That is a matter submitted to your judgment, as I have said, without the necessity of any detailed proof.

"One of the elements appropriate for you to consider and de- termine upon is what, if any, sum is proper as compensatory damages, that is to say, the sum which shall really compensate a man, so far as money is susceptible of compensating him, for his injury. The elements for you to consider in that connection are the mental pain, distress, and humiliation, if any, that he himself endured as the result of the publication. In this con- nection you are to consider what you regard to be a fair finan- cial equivalent for the derogation or detraction from his good name and reputation in the community, that the language may have occasioned.

"You may, if in your judgment it is appropriate, consider what counsel term 'smart money' or 'punitive damages.' It is not necessary that the jury should award punitive damages, and they are properly to be awarded only in case you find from the evidence that the publication was made with a wilful, wanton, or reckless disregard of the plaintiff's rights, and if you find from the evidence that that was the spirit that actuated the publica- tion,—it need not have been a spirit of personal hostility, or personal vengeance,—and if you find that the spirit that under- lay this publication was one of a wanton and reckless disregard of the plaintiff's rights, then you have a right to award him puni-

tive damages in addition to compensatory damages. The policy of the law in awarding punitive damages is to punish a defendant in proportion to the wrong done in a particular case, and to hold him up as an example to the public so as to deter other people and other newspapers from violating the rights of citizens in like manner. If you see fit to do it, and if you find that the spirit which underlies this publication was that which I have indicated, you can add to your verdict for compensatory damages, if you find one, whatever sum you think is sufficient to punish the defendant in proportion to the wrong done, and to serve to make an object lesson of this newspaper to prevent others from offending in a like manner."

Defendant's exceptions are to the parts of the foregoing to the effect that defendant had no right to publish the article and that the same was susceptible of a meaning that would hold the plaintiff up to public ridicule, contempt, or hatred; that the jury must give such meaning to the words as they would convey to the general public; that the jury might assume that the charges of the article are untrue; to the charge as to the manner in which they might arrive at compensatory damages, and to the submission of the question of punitive damages.

After verdict for plaintiff, the defendant moved in arrest of judgment because of defects in the declaration. This, and a motion for new trial also, was denied, and judgment followed.

*Mr. James S. Easby-Smith* for the appellant.

*Mr. N. Thornton Hynson* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The lengthy statement of the evidence,—much of which is irrelevant and unimportant,—as well as of other parts of the record, is due to the motions to direct a verdict, and to the numerous exceptions that were taken.

Nineteen errors have been assigned, which, however, it is unnecessary to discuss separately.

1. The last error assigned is on the denial of the motion in arrest of judgment. Plaintiff did not demur to the declaration, but pleaded thereto, and the case went to trial. There was no error committed. *Rudd* v. *Buxton, post,* 353; *Baker* v. *Warner,* 231 U. S. 588, 58 L. ed. —, 34 Sup. Ct. Rep. 175. In *Baker* v. *Warner* it was said: "Such motions are not favored. In considering them, courts liberally construe the pleadings, giving the plaintiff the benefit of every implication that can be drawn * * * in his favor. Sentences and paragraphs may be transposed. The allegations in one part of the complaint may be aided by those in another, and if, taken together, they show the existence of facts constituting a good cause of action, defectively set forth or improperly arranged, the motion in arrest will be denied."

2. The first assignment of error is founded on the exception to plaintiff's reading the entire article published by defendant on July 23, 1911, part only of which was set out in the declaration. The libelous parts of the article were set out in the declaration. This was all that was necessary, as the other parts did not alter or affect their meaning. *Weir* v. *Hass,* 6 Ala. 881, 887; *Blethen* v. *Stewart,* 41 Minn. 205, 42 N. W. 932. While plaintiff was not required to read any more than the part complained of, no possible injury was done defendant by reading the whole; moreover, it had set out the entire article in its third plea. It has nothing to complain of.

3. Certain other assignments relate to the refusal of the court to permit the defendant to read in evidence the articles set out in its third plea. So far as these relate to the articles published in the Herald, the same had been read by the plaintiff in proving his own case, and were before the jury.

The publications in the Times and Star were properly excluded. They were not relevant, and constituted no justification for the defendant's libel. *Hotchkiss* v. *Lothrop,* 1 Johns. 286. That other papers may have published articles relating to the

plaintiff and his controversy, whether libelous or not, afford no justification for defendant's publication. The plea did not make a case of conditional or qualified privilege. The plaintiff was a private person who had resigned from public office, and while the article relating to him may have made "a good story" in the view of the publishers of the Herald, it was not a privileged one. A newspaper has no peculiar privilege in such matters. *Fitzpatrick* v. *Daily States Pub. Co.* 48 La. Ann. 1116, 1135, 20 So. 173; *Burt* v. *Advertiser Newspaper Co.* 154 Mass. 238, 243, 13 L.R.A. 97, 28 N. E. 1; *Haynes* v. *Clinton Printing Co.* 169 Mass. 512, 515, 48 N. E. 275. See also *Peck* v. *Tribune Co.* 214 U. S. 185, 189, 53 L. ed. 960, 962, 29 Sup. Ct. Rep. 554, 16 Ann. Cas. 1075; *Russell* v. *Washington Post Co.* 31 App. D. C. 277, 283, 14 Ann. Cas. 820.

4. There was no error in refusing to entertain defendant's requests for instructions to the jury unless presented in writing. This is required by the 3d section, rule 44 of the Common Law Rules of the Supreme Court of the District. This rule—a most reasonable one—governs the courts in special term.

5. The exceptions to the charge of the court will be considered in their order.

(1) Where the charges in a publication tend to bring the plaintiff into contempt, ridicule, or disgrace, they are libelous *per se,* and it is not necessary that they charge a criminal offense also. *Bailey* v. *Holland,* 7 App. D. C. 184, 189; *Washington Gaslight Co.* v. *Lansden,* 9 App. D. C. 508, 530; *Washington Times Co.* v. *Downey,* 26 App. D. C. 258, 263, 6 Ann. Cas. 765; *Russell* v. *Washington Post Co.* 31 App. D. C. 277, 282, 14 Ann. Cas. 820; *Peck* v. *Tribune Co.* 214 U. S. 185, 190, 53 L. ed. 960, 962, 29 Sup. Ct. Rep. 554, 16 Ann. Cas. 1075.

(2) Where words are libelous *per se* the trial justice can so instruct the jury, leaving to them only the determination of damages; where they are not, and in the light of the extrinsic facts cannot possibly be construed to have a defamatory meaning, he may withdraw the case from the jury; if not libelous *per se,* yet in the light of extrinsic facts are susceptible of being

construed to have a defamatory meaning, they are to be submitted to the jury. *Baker* v. *Warner,* 231 U. S. 588, 58 L. ed. —, 34 Sup. Ct. Rep. 175.

There was no error in refusing to direct a verdict for the defendant.

(3) We agree with the learned trial justice that the words published were susceptible of a meaning that would hold the plaintiff up to public contempt and ridicule and disgrace. The charges that he was a "disgruntled fanatic;" had been deposed from office; and that he was getting off easy when he was simply deposed and nothing more was said concerning the manner in which he had filled the office of chief of the division, were susceptible of a meaning that would reasonably bring the plaintiff into ridicule and contempt, and injure his standing in the community. But the court did not direct the jury that the article was libelous *per se* as matter of law; but left it to them to find whether the reading public would interpret that language, as they read the article in connection with the context published, in that way; and if they found that it would not be so commonly understood they should find for the defendant. Notwithstanding the statement of the court that the words were susceptible in law of a defamatory meaning, it was left to the jury to say whether, as matter of fact, the readers of the article would, under the circumstances attending the publication, have so understood them.

(4) It was not error to charge the jury that they could assume that none of the charges was true. Defendant had not pleaded the truth of the charges. *Lauder* v. *Jones,* 13 N. D. 525, 101 N. W. 907; *Atwater* v. *Morning News Co.* 67 Conn. 504, 34 Atl. 865; *Pickford* v. *Talbott,* 28 App. D. C. 498, 506.

(5) The measure of compensatory damages was not incorrectly defined in the charge. *Washington Times Co.* v. *Downey,* 26 App. D. C. 258, 262, 6 Ann. Cas. 765.

Nor was it error to charge the jury that they might find punitive or exemplary damages if the publication was made with wilful or reckless disregard of the plaintiff's rights. *Bailey* v. *Holland,* 7 App. D. C. 184, 189. In that case it was said:

**D. C.]**                          Syllabus.

"Malice consists in doing intentionally and without justification that which must work injury to another."

Every assignment of error has been considered, but it is unnecessary to discuss them specially.

Finding no error in the proceedings on the trial, the judgment is affirmed, with costs.                          *Affirmed.*