**CURTIS PUBLISHING COMPANY,** Appellant,

v.

**Harry H. VAUGHAN,** Appellee.

No. 15201.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 9, 1959.

Decided March 31, 1960.

---

Mr. Philip H. Strubing, Philadelphia, of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court, with whom Messrs. David C. Acheson and John H. Schafer, Washington, D. C., were on the brief, for appellant. Mr. Jonathan W. Sloat, Washington, D. C., also entered an appearance for appellant.

Mr. Byron N. Scott, Washington, D. C., with whom Mr. Hyman Smollar, Washington, D. C., was on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and EDGERTON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Curtis Publishing Company appeals from a judgment entered in a libel action

after a jury awarded the appellee compensatory damages in the sum of $10,-000. Vaughan's complaint had charged that appellant had libeled him in the November 3, 1956 issue of its weekly magazine "The Saturday Evening Post." [1]

We are concerned solely with appellant's claims that the District Court erred in failing to direct a verdict in its favor on any of three grounds, viz.: the allegedly defamatory matter was not libelous per se and no special damages had been pleaded or proved; (2) the matter complained of was subject to the defense of qualified privilege since the material dealt with events relating to a public official while in office and there was no evidence that the appellant had abused that privilege; and (3) the truth of the allegedly defamatory matter had been substantially established as a matter of law.[2]

### I

The record before us shows that General Vaughan served as Military Aide to President Truman from 1945 to January, 1953. He also held a position identified as that of Coordinator of Veterans' Affairs. The Post in its issue of November 3, 1956, beginning at page 23, carried Part I of a series of four articles entitled "Confessions of 'an S.O.B.'" by Drew Pearson, introduced in an editorial note as "America's most controversial reporter." The exhibit prominently included eight photographs which filled page 25 under the caption "Pearson Has Many Enemies." One person depicted was said in a caption to be "one of the three congressmen Pearson helped send to jail." Another former member of Congress was pictured and identified by legend as having been "convicted of war-fraud charges [3] after Pearson exposed him." On the same page, the appellee Vaughan was shown in the uniform of a major general seated before a microphone, apparently testifying at a public hearing, with the legend under his photograph reading "Many Pearson charges against Harry Vaughan were later confirmed by testimony before Senate committee."

Vaughan's complaint, denouncing the caption accompanying the photograph as "false, malicious and libelous," submitted:

"The said publication specifically referred to Plaintiff by his name, in effect charged that he had committed some acts in his official capacity which had been the subject of 'charges' against him, that the said 'charges' had been investigated by a Committee of the United States Senate and confirmed by testimony before the said Committee, and was meant and intended to, could and did convey to the public the idea that Plaintiff had committed some malfeasances in office in his official capacity, that he had been 'charged' with these malfeasances by a widely read syndicated newspaper columnist, that the 'charges' had been investigated by a committee of the United States Senate, and that testimony before that committee had 'confirmed' the 'charges' of malfeasance in office, and did by insinuation and innuendo charge Plaintiff with having dealt dishonestly with the United States Government during his term of office, or with having been guilty of

---

1. No issue has here been presented as to the jury's refusal to find punitive damages or the trial judge's direction of a defendant's verdict on a second count alleging violation of Vaughan's right of privacy. As to the latter, see Elmhurst v. Pearson, 1946, 80 U.S.App.D.C. 372, 153 F.2d 467; Estill v. Hearst Publishing Co., 7 Cir., 1951, 186 F.2d 1017, 1022.

2. At the outset of the trial, the District Judge caused the record to show "that by stipulation of counsel the damage in this case is limited to the confines of the District of Columbia; and \* \* \* *District of Columbia law will govern.*" (Emphasis added.)

3. The word "charges" as here used and again under Vaughan's picture had not been applied to other public figures pictured as Pearson's "enemies."

malfeasances in office, and was meant and intended to hold Plaintiff in contempt in the eyes of the people of the District of Columbia and throughout the United States."

The Curtis Publishing Company placed a very different construction upon the allegedly defamatory matter. As the trial record shows, its position as to the meaning to be ascribed to the language in question was summed up in a proposed instruction submitted to the trial judge. The publisher there contended

> "that the caption, reasonably construed, would tend to be understood by the ordinary, average reader to mean that Pearson had charged General Vaughan with having interceded with Government agencies and departments on behalf of friends and 'five percenters' or lobbyists, and those whom they represented, and with thus having used, or permitted them to use, the great prestige of the White House, as derived from its privileged position as an important member of its staff, in obtaining or attempting to obtain special treatment for themselves or those whom they represented." [4]

█ Where the meaning of the words of the publication is in dispute, an issue of fact arises and must be determined by the jury.[5]

█ The publication "'must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. * * * If * * * it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say * * *.' " [6]

In applying these rules we have observed that a construction that the language might be defamatory does not depend upon an innocent meaning which some might ascribe to the words. "The law does not strip words to their minimum meaning and ignore their implications. It does not ignore their context. The words 'Smith got rich fast' would not imply corruption but the words 'Smith got rich fast while he was a tax assessor' might." [7]

█ Here the issue was submitted to the jury, properly we think, for the trial judge found himself unable to rule as a matter of law that the publication was not libelous.[8] Who might have authored the legend did not appear. No staff writer from the Post testified. What the "charges" were or in whose opinion the "Pearson charges" were "confirmed" was not shown. Neither in the full page illustrating Pearson's "enemies" nor in the accompanying article of November 3, 1956 could a reader discern a predicate for what the Post's staff writer had said. From beginning to end, that article, Part I of Pearson's "Confessions," made no reference whatever to Vaughan except in connection with a person whom Pearson "helped send to jail after exposing him for influence peddling under the shadow of Gen. Harry Vaughan * * *."

Considered then in the context of Pearson's having sent one former Congressman to jail as the Post's illustrations showed and its comments claimed, and of the conviction of another on war-fraud "charges" after Pearson exposed

4. The proffered instruction was denied. None of the foregoing purportedly factual material appeared in the November 3, 1956 issue on which Vaughan's action was based.

5. Baker v. Warner, 1913, 231 U.S. 588, 594, 34 S.Ct. 175, 58 L.Ed. 384.

6. Washington Post Co. v. Chaloner, 1919, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987; Gariepy v. Pearson, 92 U.S.App. D.C. 337, 339, 207 F.2d 15, 16, certiorari denied 1953, 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407.

7. Gariepy v. Pearson, supra note 6, at page 338 of 92 U.S.App.D.C. 207 F.2d at page 16.

8. Ibid.; Meyerson v. Hurlbut, 68 App.D.C. 360, 362, 98 F.2d 232, 234, 118 A.L.R. 313, certiorari denied, 1938, 305 U.S. 610, 59 S.Ct. 69, 83 L.Ed. 388.

him, the jury might reasonably conclude that the very use of the word "charges" might be thought to imply some malfeasance, possibly criminal in nature, by a White House staff member. There was no suggestion that Pearson's later articles were to deal only with impropriety, and the November 3, 1956 illustrations and captions, it seems to us, gave not even a hint that impropriety and not criminal conduct was meant. We see no basis upon which we may substitute our view for that established by the jury's verdict.

■■ The jury might readily have concluded that the Post's caption, in the setting and context described, meant to the ordinary reader everything the complaint charged that it meant. A contention that, so construed, the material is not libelous cannot stand in the face of the motion for directed verdict.[9] The trial court did not err in denying the motion, for if otherwise actionable,[10] the defamatory matter gave rise to the presumption that some damage was inevitable.[11]

The Post argues otherwise on the ground that Vaughan had been a public official from 1945 to 1953, and thus the reading public in 1956 was entitled to its published appraisal of "confirmation" of Pearson's "charges" which were aired before a Senate committee in 1949. On this aspect of the case the Post relies upon its reading of Sweeney v. Patterson.[12] Sweeney had charged that while a member of Congress, he had been libeled by published statements that his political conduct had been actuated by anti-Semitism. No special damage was alleged.[13] We refused to pass upon whether or not the statement was privileged, for clearly it had involved "no charge of crime, corruption, gross immorality or gross incompetence." We noted that under such circumstances, the public interest in Sweeney's political conduct and views was paramount since he was a member of Congress representing the whole public and all inhabitants were vitally concerned.[14]

The appellant quite overlooks a vital point which we carefully noted in the Sweeney case. Distinguishing the lack of actionable character of the statement there relied upon from publications which charged officials with crime or

9. On a motion for directed verdict the evidence must be construed most favorably to the plaintiff who shall be entitled to the full effect of every legitimate inference. Fleming v. Fisk, 1936, 66 App. D.C. 350, 87 F.2d 747; cf. Baker v. Warner, supra note 5, 231 U.S. at page 592, 34 S.Ct. at page 176.

10. See discussion in Note, Fair Comment on a Political Candidate, 37 Geo.L.J. 404, 414 (1949).

11. Gariepy v. Pearson, supra note 6; "It is elementary that in such event special damages need neither be alleged nor proved," Washington Times Co. v. Bonner, 1936, 66 App.D.C. 280, 288, 86 F. 2d 836, 844, 110 A.L.R. 393; Washington Herald Co. v. Berry, 1914, 41 App.D.C. 322; to like effect as to special damage where the published matter is clearly libelous on its face, see Thackrey v. Patterson, 1946, 81 U.S.App.D.C. 292, 157 F.2d 614; Afro-American Pub. Co. v. Rudbeck, 1957, 101 U.S.App.D.C. 333, 248 F.2d 655; Pittsburgh Courier Pub. Co. v. Lubore, 1952, 91 U.S.App.D.C. 311, 200 F.2d 355; Hughes v. Washington Daily News Co., 1952, 90 U.S.App.D.C. 155, 193 F.2d 922; cf. McCown v. Boone, 1946, 81 U.S.App.D.C. 19, 154 F.2d 19, where "malice" was a factor.

12. 76 U.S.App.D.C. 23, 128 F.2d 457, certiorari denied, 1942, 317 U.S. 678, 63 S. Ct. 160, 87 L.Ed. 544; but see Noel, Defamation of Public Officers and Candidates, 49 Colum.L.Rev. 875, 896, 897 (1949) where it is noted that there is no such broad privilege according to the "clear weight of judicial authority."

13. See discussion in Note, Libel Per Se, 26 Geo.L.J. 468, 470, 472 (1938).

14. The Post introduced in evidence two Pearson columns syndicated in the daily press as of August 4 and 5, 1949 dealing with Vaughan's White House conduct and brought out that Vaughan had not then sued Pearson. He might *then* have been advised, so far as appears, that the same public had a like interest in *his* political conduct, and, absent charges of crime and corruption, recovery would have been precluded by Sweeney v. Patterson, supra note 12.

gross immorality, we emphasized that "no such charges are involved here * * *." 15

On the other hand, our appellant over Vaughan's objection, offered in evidence as its own exhibits, the Pearson articles of November 10, 17 and 24, 1956. It has pointed us to these articles upon which the Post's staff writers relied in compiling the offending caption in Vaughan's November 3, 1956 exhibit. In appellant's statement of the case in its brief, we are told that Pearson in the articles explained *his* purpose "in trying to report what really happens in Washington: he hoped to 'have contributed somewhat to cleaner government' (Pl.Ex. 1, J.A. 96)." The Post tells us further that Pearson

> "conceived of himself as 'a sort of *public watchdog* and *goader of government on graft and inefficiency.'* (Def.Ex. 3, p. 150). *General Vaughan was one of Pearson's targets;* Pearson did not join 'the journalistic wolf pack which beset Harry S. Truman', but he 'did ride herd on some of his cronies,' including Vaughan and Vaughan's friend Maragon. 'I paid tribute from time to time to the swaggering wirepulling operations of Gen. Harry Vaughan.' (Def.Ex. 1, JA 107). 'For some time I had been showing up the manner in which General Vaughan had been using his privileged position inside the White House to do favors for friends and lobbyists.' (Def.Ex. 1, JA 108). By the summer of 1949, Vaughan 'was under Senate investigation, an inquiry which confirmed some of the things I had written about him, including the favors he had done for lobbyist friends. * * * I felt vindicated by the Senate investigating committee and turned to other news.' (Def.Ex. 1, JA 109)." (Emphasis added.)

The Post on the one hand would seem to argue that its own appraisal of Pearson's "charges" is not to be deemed defamatory when, on the other, it would link Vaughan as a target in a campaign against "graft and inefficiency." The non-actionable statements in the Sweeney case as we specifically noted, involved no charge of crime, corruption, gross immorality or gross incompetence.

We are satisfied that the trial judge did not err in submitting to the jury the issue as to the alleged defamation.16

## II

It is next argued to us that in any event the publisher was entitled as a matter of law to the defense of "qualified privilege," tersely described by publisher's counsel in the trial record as "the privilege to publish untrue facts." He said to the trial judge that he was "perfectly satisfied to treat the whole caption [supra] as a statement of fact, if that will make the charge a little easier for you, and I think it may well." Vaughan's counsel argued that the publisher had offered no evidence to establish an occasion for qualified privilege, but the publisher's attorney asserted he had not offered evidence "deliberately."

Appellant now would have us say that because General Vaughan had been a public figure between 1945 and 1953 whose conduct while a member of the White House staff had been under investigation by a Senate committee in 1949, the Post was free in 1956 to publish libelous matter concerning him unless the publisher abused its "privilege." Counsel charges error in the refusal to direct a verdict for the appellant on this aspect of the case.

We have never said that any of the news media may with impunity falsely defame any person. On the contrary, where as here the Post made its own statement for its own purposes in the

15. 76 U.S.App.D.C. at page 25, 128 F. 2d at page 459.

16. It may be noted that Pearson himself in the November 10, 1956 Post had said only that the Senate inquiry had confirmed *"some of the things I had written about him."* (Emphasis added.) Had the caption here been so worded, we would have had an entirely different problem.

November 3, 1956 issue, we have recognized as applicable law:

"'It is well settled that the publication of any statement by a newspaper made upon its own authority, and not purporting to be a report' of official proceedings or statements 'is not privileged * * *. The publication constitutes a charge by the person uttering it, and he is responsible therefor.'"[17]

The Post argues, in effect, that its caption was written as its interpretation of what Pearson's articles *would* show. The occasion was not privileged.[18] Indeed, the Post's caption in the entire setting we have described amounted to the Post's own charges against Vaughan.[19] The text of the November 3, 1956 article gave the reading public no information whatever upon which to appraise Vaughan or his conduct or the nature of the "charges" for which presumably he had been brought to book in a Senate "investigation."

 To come within a privilege recognized by the law, a publication

"must be full and accurate or the immunity is lost; if the report is garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made, the publisher is subject to liability. Of course, it is not necessary that the entire proceedings be reproduced in their every detail. It is enough that the essential and important features be included, in so far as they are pertinent to the defamatory matter, and that they be substantially accurate. Newspaper headlines, if defamatory and if they do not fairly and accurately reflect the gist of the text, are not privileged, even though the story if read in its entirety would not be misleading. This rule takes into account the very general practice of large segments of the public who read the headlines only and thus fail to get the full import of the article as an entity."[20]

We had here no headline referable to an accompanying article. We had the Post's statement of purported facts, prepared for the Post's own purposes and referable only, as it developed, to articles not yet published. Whether the Post sought to stimulate reader interest in the series yet to come and thus to enhance its sales or what other purpose it had, we cannot know for no evidence was offered, "deliberately." Clearly emerging from the record is the conclusion that the occasion of the November 3, 1956 material was not privileged.

We have said that when the "author of a libel writes under the compulsion of a legal or moral duty, or for the protection of his own rights or interests, that which he writes is a privileged communication unless the writer be actuated by malice."[21] The doctrine that one may have a legal right to publish a reply[22] to charges made by another certainly has no application upon the facts here. Again, "absolute" privilege occasionally has been discerned as where a

17. Hughes v. Washington Daily News Co., 1952, 90 U.S.App.D.C. 155, 156, 193 F.2d 922, 923; compare De Savitsch v. Patterson, infra note 18.

18. Ibid.; Afro-Amercian Pub. Co. v. Rudbeck, 1957, 101 U.S.App.D.C. 333, 334, 248 F.2d 655, 656; Pittsburgh Courier Pub. Co. v. Lubore, 1952, 91 U.S.App. D.C. 311, 312, 200 F.2d 355, 356; cf. De Savitsch v. Patterson, 1946, 81 U.S. App.D.C. 358, 159 F.2d 15.

19. See Washington Times Co. v. Bonner, 1936, 66 App.D.C. 280, 285, 86 F.2d 836, 841.

20. 1 Harper and James, Torts 432–33 (1956); and see Restatement, Torts § 611, and comment (d) (1934).

21. Dickins v. International Brotherhood of Teamsters, 1948, 84 U.S.App.D.C. 51, 54, 171 F.2d 21, 24; and see Blake v. Trainer, 1945, 79 U.S.App.D.C. 360, 148 F.2d 10.

22. National Disabled Soldiers' League v. Haan, 1925, 55 App.D.C. 243, 248, 4 F. 2d 436, 441.

public officer speaks out in relation to **a** matter coming within the scope of his legal duties.[23]

■ The instant case clearly does not fall into any of the categories mentioned. We think the trial judge did not fail in his discernment or application of the District of Columbia law. It follows that he did not err in refusing to direct a verdict on the ground of privilege.[24]

### III

■ Of course truth is a defense to a charge of libel,[25] as appellant finally asserts. To argue that the trial judge erred in failing to direct a verdict on the ground that the truth of the questioned material had been shown as matter of law is quite another matter. Here the publisher offered no evidence as to the November 3, 1956 issue. Instead, it called Vaughan as an adverse witness, and then introduced as its own exhibits the three later articles in the series. It examined Vaughan at length, not only as to material contained in the later articles but as to two newspaper columns by Pearson which had appeared in his syndicated[26] newspaper releases of August 4 and August 5, 1949.

Vaughan as a witness was asked to explain references to him in such items and in testimony offered at the Senate committee hearings. Much of the latter record including Vaughan's own committee testimony was received in evidence as was the committee's Interim Report.

Vaughan had testified before the committee and as a witness at the trial to general approval by President Truman of his performance of his duties. He supplied his own version of various incidents described in the appellant's exhibits. He denied that any charges or allegations had been proved.

In this state of the record, with no evidence as to the "truth" of the offending material in the November 3, 1956 issue, the Post moved for a directed verdict on the ground that it had substantially established "truth." It relied upon Vaughan's replies on cross examination and upon the text of the later articles and the committee record with reference thereto. The trial judge may well have concluded that the Post had merely been shadowboxing with its own strawman. He may have decided that readers of the Post who bought and read the November 3, 1956 issue were not bound to buy and read the Post for the remainder of the month possibly thus to ascertain for themselves the basis for the Post's caption. It was by no means demonstrated as a matter of law that subjects mentioned in the remaining articles or the committee record were necessarily true as to "many" "charges" against Vaughan.[27] We can not say that the

---

23. Barr v. Matteo, 1959, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; see dissenting opinion, Barr v. Matteo, 100 U.S. App.D.C. 319, 322, 244 F.2d 767, 770, reversed 1957, 355 U.S. 171, 78 S.Ct. 204, 2 L.Ed.2d 179; and see Cochran v. Couzens, 59 App.D.C. 374, 42 F.2d 783, certiorari denied 1930, 282 U.S. 874, 51 S.Ct. 79, 75 L.Ed. 772, as to statements by a Senator speaking in Congress, and Young v. Young, 1927, 57 App.D.C. 157, 18 F.2d 807 as to privileged matter in a pleading before the court.

24. We are not here concerned with the *quondam* defense of "fair comment" discussed generally in Washington Times Co. v. Bonner, supra note 11. And see Potts v. Dies, 1942, 77 U.S.App.D.C. 92, 132 F.2d 734, certiorari denied, 1943, 319 U.S. 762, 63 S.Ct. 1316, 87 L.Ed. 1713; cf. Sullivan v. Meyer, 78 U.S.App.D.C. 367, 141 F.2d 21, certiorari denied 1944, 322 U.S. 743, 64 S.Ct. 1145, 88 L.Ed. 1575.

25. Somerville v. Acacia Mut. Life Ins. Co., 1945, 80 U.S.App.D.C. 144, 149 F.2d 836; Sullivan v. Meyer, supra note 24.

26. A pre-trial stipulation showed that Pearson's column since prior to 1949 had been published in more than 400 newspapers with a national circulation of more than 30,000,000 copies per column.

27. The verdict indicates at least that the jury likewise was unimpressed, especially since Vaughan's own answers and demeanor were entitled to consideration.

judge erred in refusing to direct a verdict for the publisher.

We conclude that Vaughan is entitled to his verdict.

Affirmed.

EDGERTON, Circuit Judge (dissenting).

I think Sweeney v. Patterson, 76 U.S. App.D.C. 23, 128 F.2d 457, requires reversal of the present judgment.

Patterson's newspaper had charged Congressman Sweeney with opposing a pending judicial appointment for anti-semitic reasons. The Congressman sued the publisher for libel. Although the charge was plainly defamatory and therefore libelous, the District Court granted the defendant's motion for judgment on the pleadings. The plaintiff appealed, and we affirmed the judgment. We said: "Even if the [appellees'] statements are false, appellant has stated no claim on which relief can be granted. The cases are in conflict, but in our view it is not actionable to publish erroneous and injurious statements of fact and injurious comment or opinion regarding the political conduct and views of public officials, so long as no charge of crime, corruption, gross immorality or gross incompetence is made and no special damage results. Such a publication is not 'libelous per se.' We need not consider whether it is privileged. Appellant might be entitled to relief if he had lost his seat in Congress, or had lost employment, as a lawyer or otherwise, or had been put to expense, or had suffered any other economic injury, by reason of appellees' statements. We do not decide that question, since it is not before us. Appellant alleges no such injury." 76 U.S.App.D.C. at page 24, 128 F.2d at page 458.

We used the words "not 'libelous per se'" in the technical sense of "not actionable without special damage". General Vaughan, like Congressman Sweeney, alleges no special damage.

General Vaughan complains of these words and no others: "Many Pearson charges against Harry Vaughan were later confirmed by testimony before Senate committee." If we assume in the plaintiff's favor that these words convey "erroneous and injurious statements of fact and injurious comment or opinion", it appears to me that the rule of the Sweeney case exactly fits this case and the defendant is entitled to a directed verdict.

Vaughan, like Sweeney, was a public official. He was one of seven persons pictured on a page of the Saturday Evening Post under a general heading "Pearson has many enemies". The six others were a Senator, two Congressmen, two cabinet officers, and a "lobbyist". This context makes it clear, and the plaintiff concedes, that the "charges", whatever they may have been, concerned his conduct as a public official. They concerned, in other words, his "political conduct".[1]

It seems to me obvious that here, as in Sweeney, "no charge of crime, corruption, gross immorality or gross incompetence is made * * *." 76 U.S.App. D.C. at page 24, 128 F.2d at page 458. Directly under the plaintiff's picture and the caption he complains of, the defendant printed a picture of Secretary Hurley, with the caption "[Pearson's] long feud with Hoover's Sec. of War Patrick J. Hurley rocked the capital." Lower down was a picture of the late Secretary Forrestal, with the caption "Friends of Defense Secretary James Forrestal claimed Pearson's relentless attacks helped drive the Secretary to suicide". Another picture bore the caption: "Forrestal's funeral cortege. [Pearson] reports that after this tragedy, he felt 'an almost paralyzing urge' to take his own life." That the Post, elsewhere on the same page, expressly mentioned criminal

1. The definition of "political" in Webster's New International Dictionary, 1952 ed., begins: "Of or pertaining to polity, or politics, or the conduct of government, referring in the widest application to the judicial, executive, and legislative branches; of or pertaining to, or incidental to, the exercise of the functions vested in those charged with the conduct of government: * * *"

convictions of two other men does not, in my opinion, permit an inference that it impliedly attributed criminal conduct to Secretary Hurley, or to Secretary Forrestal, or to General Vaughan. I think we should hold as a matter of law that readers of the Post would not ordinarily draw such an inference. " 'A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. * * *' " Washington Post Co. v. Chaloner, 250 U. S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987. It seems to me clear that readers would ordinarily understand the "charges against Harry Vaughan", which were said to be "confirmed by testimony" not before a court or a grand jury but "before Senate committee", to be charges of impropriety, not of crime. Readers know that some kinds of official conduct, such as accepting expensive hospitality from persons who are asking for official favors, are not criminal but are commonly deplored and often made the subject of "charges" by columnists.

In my opinion the principle of the Sweeney case would have entitled the defendant to a directed verdict even if the publication had implied some minimal charge of crime. To hold, as we held in Sweeney, that it is *not* actionable to publish injurious statements regarding the political conduct of a public official "so long as no charge of crime, corruption, gross immorality or gross incompetence is made", is not to say that every statement which does charge a public official with any one of those things *is* actionable. Sweeney contains no such dictum. Besides being irrelevant to the question we had to decide, any such dictum would have been inconsistent with the reasons we gave for our decision: "Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. * * * Everyone, including [the defendants] and their readers, has an interest to defend, and any one may find means of defending it. The interest of the public

here outweighs the interest of [the plaintiff] or any other individual. The protection of the public requires not merely discussion, but information. * * * Errors of fact * * * are inevitable. Information and discussion will be discouraged, and the public interest in public knowledge of important facts will be poorly defended, if error subjects its author to a libel suit without even a showing of economic loss." 76 U.S.App.D.C. at page 24, 128 F.2d at page 458.

Although here, as in Sweeney, we need not consider whether the publication is "privileged" or, on the contrary, would have involved liability if there had been a showing of economic loss, the analogy of privilege is close. Where a privilege exists, it extends to a charge of crime. For example, in Dickins v. International Brotherhood of Teamsters, 84 U.S.App. D.C. 51, 53–54, 171 F.2d 21, 23–24, the defendants' magazine had charged the plaintiff with committing a series of unprovoked assaults. The alleged assaults were clearly criminal. We held that the charge of crime was within the defendants' privilege of defending themselves against charges the plaintiff had made against them. No reason appears why the analogous Sweeney principle should not likewise cover a charge of crime.

In Barr v. Matteo, the Supreme Court, reversing this court, held that a public official's injurious words "within the outer perimeter of [his] line of duty" were absolutely privileged. 360 U.S. 564, 575, 79 S.Ct. 1335, 1341. The five Justices who concurred in the Court's judgment did not concur in an opinion. Four joined in an opinion which did not turn upon the fact that the injured plaintiffs were themselves public officials. But Mr. Justice Black, one of the five who concurred in the judgment, said: "The effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees. Such an informed understanding depends, of course, on the

freedom people have to applaud or to criticize the way public employees do their jobs, from the least to the most important." 360 U.S. at page 577, 79 S.Ct. at page 1342.