[No. 5493.]

THE ROCKY MOUNTAIN NEWS PRINTING COMPANY v. FRIDBORN.

1. **Libel — Defenses — Good Faith —** One charged with the publication of what is upon its face capable of a defamatory sense, may, while admitting the publication, and its falsity, plead and show the circumstances, that the publication was without malice, and was not intended, nor understood by those who read it, in a defamatory sense.—(446-449)

2. **Libel—Questions for the Court and Jury**—Whether words which in their ordinary sense are actionable per se are capable of a special meaning, not defamatory, is for the court. When this question is resolved in the affirmative, the sense in which the words were in fact used and understood, is for the jury.—(449)

3. **Libel—Mitigation of Damages**—Under sec. 69 of the Code defendant may rely upon mitigating circumstances to reduce the damages, though pleaded in bar of the action.—(451)

4. **Error in Sustaining a Demurrer—Whether Cured by Admission of Evidence**—Error committed in sustaining a demurrer to an answer or striking material and relevant matter therefrom, is not cured by permitting the defendant to give evidence of such matters, unless it appears that he had prepared for, and had full benefit of the defense, so rejected from the issues.—(452)

*Appeal from Denver District Court*—Hon. P. L. PALMER, Judge.

Mr. THOMAS M. PATTERSON, and Messrs. RICHARDSON & HAWKINS, for appellant.

Mr. THEODORE H. THOMAS, for appellee.

The complaint alleges that the plaintiff is unmarried, and of the age of seventeen years. That the defendant corporation is the publisher of The Rocky Mountain News, a newspaper of large circulation. That in said newspaper, on July 24, 1902, the defendant maliciously published of and concerning the plaintiff, the following false and defamatory article, to wit: "Miss Fridborn a Mother.—Florence Fridborn, the girl who was assaulted by an unknown man in North Denver last New Year's eve, became a mother yesterday." That by reason of said publication plaintiff was damaged in the sum of $10,000, for which sum judgment is prayed.

The defendant's answer admits that the defendant owned the paper mentioned; that it had the circulation alleged, and that it published the article as set forth in the complaint.

The answer continues as follows:

"Third.   It denies that the defendant published . said article maliciously, and denies that it was a libel, and denies that it was defamatory, and denies that it was a false article, but admits that that portion of the article which states that the plaintiff became a mother was incorrect, and admits that the said plaintiff did not and has not become a mother, or given birth to a child, and alleges that that portion of the article which states that the plaintiff was assaulted by an unknown man in North Denver last New Year's eve was true and correct, *and that the plaintiff was, on or about said date, criminally assaulted by an unknown man in North Denver.   And the defendant alleges that on or about said date, the plaintiff reported to the officers of the law that she had been criminally assaulted by an unknown man, and outraged.   That said attack upon her created great excitement in the city and state.   That numbers of men were, from time to time, arrested upon said charge, and the occurrence attracted great attention to the plaintiff.   That thereafter and on, to wit, the 23d day of July, 1902, it was reported to said newspaper, by what was by the said newspaper upon reasonable grounds believed to be reliable authority, that the plaintiff had become a mother, and believing the same to be true, and without any malice whatever, and with the motive only of publishing the news, the said article was published. . That said article was not published in any conspicuous or prominent place in said paper,* and on the following day, upon learning that said statement was not correct, there was published in the regular edition of said paper, the statement that the report that plaintiff had become a mother was wholly groundless.   *That none of the owners of said paper or of said company knew of the article.*

"Fourth. Denies each and every other allegation in the complaint contained, not hereinbefore admitted or denied."

And for a second and further answer, and defense, defendant says:

"That on, to wit, the evening of the 31st day of December, 1901, the plaintiff, who at that time was sixteen years of age and over, with her brother ............... Fridborn, had repaired to a lonely lake in or near North Denver, in the county aforesaid, to engage in the pastime of skating. That she and her brother were then and there approached by a man apparently twenty-one years of age and over, but to the plaintiff and defendant unknown, who did then and there order the plaintiff and her brother to lie down upon the ground where she and her brother were; that the brother, anticipating that the person so commanding intended to assault and ravish his sister, resisted, upon which the said ruffian struck him with an ax and killed him; that there and immediately thereafter the said assailant seized and choked the said plaintiff into insensibility and did there and then, notwithstanding the resistance of plaintiff, as defendant is informed and believes, assault and ravish and carnally know the said plaintiff. That immediately, and upon the day following the said murder and criminal assault, and for many days thereafter, the daily newspapers printed and published in the city of Denver, in the county aforesaid, to wit, The Rocky Mountain News, The Denver Post, The Denver Times and the Denver Republican did contain full, complete and extended notices of said murder and assault, many columns of said paper being filled with the accounts of the same, and the crime charged in said newspaper articles against the said murderer and assailant of plaintiff was that he had feloniously killed and murdered plaintiff's said

brother and thereupon had choked plaintiff into insensibility and did then and there criminally assault said plaintiff, meaning thereby that he had criminally assaulted her and had carnal knowledge of her against her will. That these statements in the said newspapers were widely and generally read, and, as defendant is informed and believes, were without exception accepted and regarded as true, and they arouse great ire and indignation against the perpetrator of the crime, for the said plaintiff was a pure and virtuous girl and beloved and respected by all her friends and acquaintances, and the said brother was a valiant and manly boy, and was killed because of his attempted defense of his sister's, plaintiff's honor.

"That the publication in The Rocky Mountain News complained of was printed and published without any malice or ill will whatsoever. That the defendant had at all times sympathized with the plaintiff on account of the outrage aforesaid, and by reason of her youth and good character, and had in the newspaper published by it so expressed its feelings in the strongest and plainest language that it could employ. That the statement in the publication complained of had reference solely to the outrage aforesaid perpetrated upon plaintiff, and though, as defendant subsequently learned, the statement that she had become a mother was untrue, it was published upon an honest belief that it was true, the same having been prepared for publication by a reporter, an employe of the defendant, who theretofore had been reliable, conservative and trustworthy in his statements of the news he gathered for publication, and had been instructed by defendant to report as news only that which he found to be true. That the publication aforesaid was intended to carry with it, and did in fact carry, the information that

the plaintiff became a mother as the result of the outrage aforesaid committed upon her person, and the carnal knowledge which, as affiant · is informed and believes, the perpetrator of the outrage had of the plaintiff at the time of the said assault; and defendant avers that such was the sole and only view taken of said publication by those who knew the plaintiff or had heard or read of the criminal assault aforesaid. And defendant avers that the said publication, by reason of the facts aforesaid, in no manner charged or implied any want of chastity upon the part of plaintiff. That while the said publication was untrue as aforesaid, the same, by reason of the facts aforesaid, was not defamatory or libelous, and it in no wise caused her to lose her reputation for virtue and chastity, and defendant denies that the publication defamed the plaintiff in any way or brought her into disrepute, socially or morally, and it denies that it damaged her in the sum of $10,000, or any other sum."

The plaintiff filed a motion to strike out those parts of the third paragraph of the answer appearing above in italics, and also demurred to all that portion of the answer beginning with the words, "And for a second and further answer and defense, defendant says."

The motion to strike and the demurrer were both sustained, and thereupon replication filed.

The issues, being thus made, the cause was tried to a jury, resulting in a verdict for plaintiff, who is appellee here. The defendant thereupon filed a motion for a new trial, which being overruled, judgment was entered on the verdict and the case brought here for review.

Mr. JUSTICE WHITE delivered the opinion of the court:

The appellant contends that the judgment should

be reversed for various reasons, but we deem it necessary to consider, only, those relating to the action of the court in sustaining the demurrer to the second defense, and the striking out certain parts of defendant's answer.

The demurrer, to the second defense, was based upon the ground that it did not state facts sufficient to constitute a defense, and that the matters therein set forth were immaterial and irrelevant.

Directing our attention to the defense demurred to we find that, while some of the allegations therein are legal conclusions, others are clearly well plead, and as to such the demurrer confessed their truth, and the ruling of the court thereon deprived the defendant of the right to show to the jury what the facts of the case were, how the publication came to be made, the way it was intended, and was understood, by the readers of the paper. These we think the defendant had a right to bring before the jury and it was error to limit the pleadings in that respect.

Libel is defined by Mills' Ann. Stats., § 1313, as follows: ''A libel is a malicious defamation expressed either by printing, or by signs, or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him or her to public hatred, contempt or ridicule.''

Under this statute the defamation must be malicious, and as applied to this case, must impeach the virtue of the plaintiff. While it is true that the publication concerning one of a false and scandalous article, libelous *per se,* implies malice sufficient to support the charge, and entitle the plaintiff to compensatory damages, it does not preclude a defendant from showing there was, in fact, no maliciousness in the publication and thus prevent exemplary damages

being recovered. The effect of the implied malice from the publication of a libelous article merely enables the plaintiff to go forward without other proof of malice.—*Republican Pub. Co. v. Mosman*, 15 Col. 399, 409; *French v. Deane*, 19 Colo. 504, 509; *Republican Pub. Co. v. Conroy*, 5 Col. App. 262, 266; *Williams v. Williams*, 20 Colo. 51, 69.

The article under consideration, in order to be libelous, must also impeach the virtue of the plaintiff. Every false article is not an actionable libel, just as every untruth is not a lie. To be an actionable libel the elements to make it such must be present in the article itself, or fairly implied therefrom and the circumstances surrounding its publication. So if the elements that constitute libel are clearly expressed in the article, it is actionable *per se,* and becomes conclusive upon the publisher, unless, under the circumstances, the words used were fairly capable of being understood in a special sense, rendering them not defamatory, and that they were so understood.

The intent of the publisher and the effect of the publication, must be gathered from the words and the circumstances under which they were uttered, and the publisher is, *prima facie,* presumed to have used them in the sense which their use is calculated to convey to the minds of the readers of the publication. When so construed the words may be defamatory on their face, in which case the action may be maintained, unless the defendant can, and does, allege and prove, that, under the circumstances, they were fairly capable of being understood in a special sense, rendering them not defamatory, and that they were so understood. Or they may not be defamatory on their face, in which case the action cannot be maintained, unless the plaintiff can, and does, show that they were, under the particular circumstances, fairly ca-

pable of a special meaning rendering them defamatory and that they were so understood.

We find in vol. 2, Current Law, p. 707, note, the law applicable to this case stated as follows:

"If the words, when construed according to their natural and ordinary meaning, are defamatory on their face, which, as we have seen, is a question of law for the court, the action may be maintained unless the defendant, and the burden is on him, can and does show that they were capable of a special meaning rendering them not defamatory, and that they were so understood.—*Peake v. Oldham*, Cowp. 275; Bigelow's Cas. 122; Bigelow's Lead. Cas. 73.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"The mere fact that the words might possibly have been used in a special sense rendering them not defamatory, is no ground for so construing them, so as to exempt the defendant from liability, instead of giving them their natural meaning, unless it is shown that they were in fact used and understood in such special sense.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Although the words complained of are not only capable of the defamatory meaning ascribed to them, but ordinarily and naturally have such meaning, they are not actionable, where the defendant proves the circumstances under which they were used, and these circumstances show that the words were not only used, but understood by the hearers, in a sense which does not render them actionable.—Pollock Torts (Webb's ed.), 313; *Lord Cromwell's Case*, 4 Coke 13; *Van Rensselaer v. Dole*, 1 Johns. Cas. (N. Y.) 279; Chase's Cas. 115; *Dedway v. Powell*, 4 Bush (Ky.) 77, 96 Am. Dec. 283; *Trabus v. Mays*, 3 Dana (Ky.) 138, 28 Am. Dec. 61; *Shecut v. McDowell*, 3 Brev. (S. C.) 38, 5 Am. Dec. 536; *Fawcett v. Clark*, 48 Md. 494, 30 Am. Rep. 481; *Egan v. Semrad*, 113 Wis. 84.

"Thus, as we have seen, it is not actionable to call a man a 'murderer' where the word is shown to have been used and understood with reference to his killing game by engines or traps (*Lord Cromwell's Case*, 4 Coke 13), or to call men 'highwaymen, robbers and murderers,' where the words are shown to have been used and understood with reference to transactions known not to amount to the charge the words import.—*Van Rensselaer v. Dole*, 1 Johns. Cas. (N. Y. 279."

It is clearly a question of law for the court to determine whether or not words constituting an alleged libel, and which are actionable *per se*, are capable of having the special meaning claimed by a defendant, and when the court holds that words, ordinarily actionable *per se*, may, nevertheless, under the circumstances of a particular case, have such special meaning, then it becomes a question of fact, to be determined by the jury, as to what the real meaning is, and how the words were understood.

To illustrate these principles we adopt the example suggested by counsel. The wife of A is despondent, because her husband neglects her, and commits suicide. These facts are well known to the public generally. B thereupon, while the matter is fresh in the minds of the people, publishes of A that he murdered his wife. A sues B for libel, alleging that B accused him of having committed murder. B answers that while the language used would ordinarily mean what A claims, yet, under the circumstances of the accusation, the real meaning was that A's absence from home, and neglect of his wife, so preyed upon her mind that she killed herself, and that the readers of the publication so understood the charge. Under these circumstances the court certainly would have no right to sustain a demurrer to the answer, and to hold that the publication means

that plaintiff was guilty of homicide. Under such circumstances it would be for the jury to determine whether or not the publishers intended, and the readers did, or did not, understand, the language used to mean as contended by defendant.

It is certainly libelous, *prima facie,* to say of an unmarried woman that she has become a mother, for such words ordinarily imply the want of chastity, and bring the case clearly within the statutory definition of libel. Almost without exception such a charge carries with it the imputation that the female is guilty of fornication, is lacking in virtue, but we are of the opinion that this does not necessarily follow. To say of an unmarried female, who has been carnally known against her will, that she has become a mother does not necessarily charge her with unchastity or impeach her virtue. It is not a certain accusation of unlawful or illicit intercourse on her part. It does not necessarily mean that she is guilty of fornication or any wrong. It may mean only that mysterious nature has taken its course in that process by which the human race is propagated and continued. An unmarried female may become a mother and still be virtuous. Such an one, who has been carnally known against her will, and as a result thereof becomes a mother, has not thereby lost her virtue, nor her chastity. She may, notwithstanding the outrage committed upon her, be of unspotted purity. The child in her arms is not the result of her own evil. Marian Erle in "Aurora Leigh," expresses this thought when, with her babe in her arms, she says:

"Man's violence,
Not man's seduction, made me what I am."

Sec. 69, Mills' Ann. Code, expressly provides that the answer in an action for libel may allege,

"both the truth of the matter charged as defamatory and any mitigating circumstances, to reduce the amount of damages, and    *   *   *    (the defendant) may give in evidence the mitigating circumstances." Appellee contends, notwithstanding this code provision, that the matters stricken did not constitute a defense to the action, and not being plead as in mitigation of damages but rather designated a defense, they were properly stricken. We cannot accept this view. If it be admitted that the matters stricken from the answer did not constitute a defense, such matters, if proven, were certainly "mitigating circumstances to reduce the amount of damages." It is wholly immaterial what the defendant stated was the purpose of the facts plead. If the facts set forth were said to be ,a defense, and they failed in that respect, yet were facts that would reduce the damages recoverable, it was the duty of the court to permit them to stand.

It has been held that a defendant newspaper may plead in mitigation of damages that it merely copied the libelous article from another paper.—*Arnott v. Standard Assn.* 3 L. R. A. (Conn.) 69.

In *Edwards v. San Jose P. Society,* 37 Amer. St. (Cal.) 70, it is held, that while good faith is not a defense, it may be pleaded in mitigation of damages.

In *Republican Publishing Co. v. Mosman, supra,* 409, this court said:

"If the truth of the published matter could be established by evidence, it was a complete justification and defense. The defendant was also entitled to give in evidence any circumstances properly in mitigation of said publication, for the purpose of reducing the amount of damages, even if the publication was, in fact, false.—Const., art. 2, § 10; Code Civil Proced., § 69."

The action of the court disregarded these well known principles of law and was, therefore, erroneous. It is contended, however, that the trial court, being presided over by a different judge than the one passing upon the pleadings, nevertheless permitted the defendant to go into the matter of the circumstances of the publication, and, therefore, the error, if any, was cured. This might be true if it were clearly evident from the record that the defendant had prepared itself upon, and fully covered the matters as alleged, but we do not think the record shows that state of facts.

The sustaining of the demurrer, and the striking of portions of the answer by the trial court are so at variance with our view of the law applicable to this case, that the judgment must be, and accordingly is, reversed.                                    *Reversed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY concur.