**AFRO–AMERICAN PUBLISHING CO., Inc., Appellant,**

v.

**Eli JAFFE, t/a Douglas Pharmacy, Appellee.**

**No. 18363.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 18, 1965.

Decided On Rehearing En Banc, Aug. 23, 1966.

Mr. George H. Windsor, Washington, D. C., with whom Messrs. George E. C. Hayes and Julian R. Dugas, Washington, D. C., were on the brief, for appellant.

Miss Joyce Capps, Washington, D. C., for appellee.

Before BAZELON, Chief Judge, and FAHY, WASHINGTON,* DANAHER, BURGER, WRIGHT, McGOWAN and LEVENTHAL, Circuit Judges, sitting *en banc*.**

* Circuit Judge Washington became Senior Circuit Judge on November 10, 1965.

LEVENTHAL, Circuit Judge.

This is an appeal from a judgment in favor of appellee (plaintiff) in an action for libel and for invasion of privacy, based on an article and a photograph in the October 14, 1961 issue of the Washington Afro-American ("Afro"), published by appellant (defendant) corporation. It was stipulated that plaintiff sustained no economic loss as a result of the publication. The court, which tried the case without a jury, found injury to the plaintiff consisting of his disturbance and concern as a result of the publication and awarded $500 as compensatory damages. The court also ruled that the publication was made with malice, said malice being presumed from the nature of the published words and the lack of justification therefor, and awarded punitive damages in the amount of $2000. The court stated that its awards were based on both counts of the complaint, i. e., libel, and invasion of privacy. As to compensatory damages, we affirm. As to punitive damages, we reverse and remand.

The material facts are not complicated and for the most part require no resolution of dispute. Plaintiff, a pharmacist, operates a local drugstore. About eighty percent of his customers are Negroes. He and his wife are white, but his employees are all Negroes. His store is a retail outlet for publications of interest to Negro readers. From 1954 until June 1961, it was one of some 400 retail outlets in the Washington area selling the Afro, a newspaper of some 11,000–12,000 circulation, published twice weekly.

In June 1961 plaintiff telephoned Mr. C. Sumner Stone, editor and manager of the Afro, to discuss headlines he considered inflammatory, and to voice his view that the newspaper was not contributing to a better understanding between the races. The two men had a general conversation, and there was no talk of any cancelation.

** Circuit Judge Tamm did not participate in the hearing or decision of this case.

In September 1961 plaintiff telephoned the circulation department in order to cancel his handling of the Afro. His call was routed to Mr. Stone, who was responsible for maintaining circulation in addition to news and editorial policy. When Mr. Stone asked why plaintiff wanted to cancel, plaintiff responded that the paper's headlines and policies were causing racial mistrust and ill feeling and directing animosity against himself. A week or two later Mr. Stone went to the store and asked again why plaintiff wanted to cancel, and was told again that plaintiff thought the paper was spreading racial hatred and distrust. Apparently at this time plaintiff also raised the point that the newspaper had carried a paid advertisement of the Communist Party, and seemed uninterested when Mr. Stone noted that the same ad had been carried by prominent New York and Washington newspapers. Mr. Stone became angry and walked out.

In the October 14, 1961 edition of the Afro, Mr. Stone's column, "A Stone's Throw," was captioned: "ONE MAN'S WAR IN SE AGAINST THE AFRO." The subject-matter was the refusal of the proprietor of the named drugstore to continue to handle Afro. Mr. Stone reiterated in his column, what he said he had told plaintiff in conversation, that plaintiff's action, along with plaintiff's accusation that Afro was spreading racial hatred and distrust, made plaintiff appear to be a bigot. The column further stated that plaintiff had told Mr. Stone a story illustrating the ignorance of his customers and the low level of intelligence of the people in the neighborhood. Plaintiff's trial testimony denying this assertion was obviously given

credit over Mr. Stone's testimony. Plaintiff's witnesses testified that he was not bigoted and enjoyed a good reputation for racial relations; these assertions were given credit and indeed were not disputed.

## I

Consideration of the various libel questions presented by this case might not be necessary if the claim of invasion of privacy adequately supported the recovery. A common law action for invasion of privacy is maintainable in the District of Columbia. Its existence is recognized in well-reasoned District Court opinions,[1] and is implicit in Bernstein v. National Broadcasting Co.[2] It represents a vindication of the right of private personality and emotional security, the essence of the interest protected being aptly summarized in Judge Cooley's perceptive phrase, "the right to be let alone."[3] The historic 1890 article of Louis D. Brandeis and Samuel Warren[4] stressed the need for solitude and privacy as a counterpoise to the intensity and complexity of contemporary civilization. That was written at a time when privacy was imperiled by the rise and conspicuous success of the yellow journalism of the 19th century. The action is no less imperative under the conditions of today, when privacy is imperiled by the communications explosion, and by a deplorable eruption of all manner of mechanical and electronic devices for snooping.

However, the right of privacy is not an absolute. The Restatement of Torts states that liability attaches to a person "who unreasonably and seriously interferes with another's interest in not having his affairs known to others."[5]

1. See Bernstein v. National Broadcasting Co., 129 F.Supp. 817 (D.D.C.), affirmed, 98 U.S.App.D.C. 112, 232 F.2d 369, cert. denied, 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed. 2d 239 (1955); Peay v. Curtis Publishing Co., 78 F.Supp. 305 (D.D.C.1948).

2. Cited *supra* note 1. Although the court affirmed a judgment for defendant, it rested on the "long, careful and exhaustive opinion" of Judge Keech in the District Court.

3. COOLEY, TORTS 29 (2d ed. 1888).

4. Warren and Brandeis, The Right to Privacy, 4 HARV.L.REV. 193 (1890).

5. RESTATEMENT, TORTS § 867, Interference with Privacy (1938) (hereafter sometimes cited RESTATEMENT, TORTS OR RESTATEMENT).

An action is maintainable even when all statements made are completely true and accurate.[6] Different patterns of interference are reflected in the cases, and a variety of sub-doctrines have evolved.[7] The right of privacy stands on high ground, cognate to the values and concerns protected by constitutional guarantees.[8] But this must be accommodated to the need for reasonable latitude for the selection of topics for discussion in newspapers. That right of the press, likewise supported by constitutional guarantees, is crucial to the vitality of democracy. The courts are called upon here, as elsewhere in the law, to harmonize individual rights and community interests. In appraising challenged violations of privacy a "distinction can be made in favor of news items and against advertising use." [9]

■ We think the trial court erred in finding that the case at bar involved an actionable invasion of privacy. When a proprietor of a news vending outlet in a predominently Negro neighborhood discontinues the handling of a newspaper oriented to Negro readers, the matter is appropriate for newspaper discussion, with pictorial accompaniment, without fear of an overhanging action for invasion of privacy.

## II

Although his interest in privacy for his actions and racial sentiments did not give plaintiff an immunity from public discussion, he had, we think, a right to responsible newspaper discussion, which does not descend to the level of false, defamatory statements. We now discuss the reasons why we reject appellant's prayer for dismissal of plaintiff's libel action.

## A

■■ The District Court characterized the charges as "tending to bring the plaintiff into contempt, ridicule and disgrace in the community in which he operated his business." The facts support this finding. The finding if anything applied a stricter standard of defamation than defendant was entitled to. Under the ultimate and broader standard a publication is defamatory if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.[10] Moreover, defamation turns

6. Barber v. Time, Inc., 348 Mo. 1199, 159 S.W.2d 291 (1942).

7. See PROSSER, TORTS § 112 (3d ed. 1964) (hereafter PROSSER, TORTS or PROSSER.)

8. In Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966), the Supreme Court pointed out that both the Fourth and Fifth Amendments are concerned with "constitutional values * * * reflecting the concern of our society for the right of each individual to be let alone." The Court also spoke in terms of "the Constitution's concern for the essential values represented by 'our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life * * *." ' " Ibid. For other references to the existence and importance of a zone of privacy established by constitutional guarantees, see Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961); Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965); DeGregory v. Attorney General of State of New Hampshire, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966).

9. RESTATEMENT, TORTS § 867, Comment d.

10. DeSavitsch v. Patterson, 81 U.S.App. D.C. 358, 360, 159 F.2d 15, 17 (1946). See also RESTATEMENT, TORTS § 559; PROSSER, TORTS 756ff. Of course plaintiff need not show tendency to prejudice him in the eyes of everyone in the community or all his associates. It suffices to establish defamation that the publication tends to lower plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates. See RESTATEMENT, TORTS § 559, Comment e; Peck v. Tribune Co., 214 U.S. 185, 190, 29 S.Ct. 554, 53 L.Ed. 960 (1909).
That this standard is broader than, though overlapping, the test of contempt, ridicule or disgrace, is illustrated by the case of an article falsely stating that plaintiff had been raped. Such an article

on whether the communication or publication tends, or is reasonably calculated, to cause harm to another's reputation, and it is not necessary for plaintiff to prove that this was its actual result.[11]

■ Appellant's publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed.[12] The article, captioned ONE MAN'S WAR IN SE AGAINST THE AFRO, stated that plaintiff, by canceling his subscription, "would appear to be a bigot," and that he told a story about a customer's ignorance which he said illustrated the low level of intelligence of the people in the neighborhood near his drugstore. These false statements were critical in the total impact of the article. The article contained other items that were true, but in the setting already described these only reinforced the defamatory impression.[13] Partial truths are not necessarily even mitigating in this branch of the law, for the defamer may be the more successful when he baits the hook with truth. What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest.

It suffices, in support of the judgment, that the column under discussion would be reasonably understood by the average reader in the community concerned to signify that plaintiff is a bigot, racially prejudiced, and scornful of the Negro race.

■ Appellant contends that as a matter of law the article is not libelous, since Mr. Stone did not flatly state that plaintiff was prejudiced, and because it is not a statement of fact about plaintiff's conduct but a statement of opinion about his attitude. Where readers would understand a defamatory meaning liability cannot be avoided merely because the publication is cast in the form of an opinion, belief, insinuation or even question.[14] A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community. See Christopher v. American News Co., 171 F.2d 275 (7th Cir. 1948), where it was held actionable to charge that one is pro-Nazi.

## B

Appellant's arguments that as a matter of law the article is not libelous shade into a contention that the statements are within the scope of a privilege provided by law, and hence are not actionable.

There are two analytically distinct claims of privilege. Although the "public interest" privilege, discussed below, is

---

evokes sympathy rather than disgrace. Yet it lowers the lady's esteem in the community and is actionable. PROSSER, TORTS 756; 1 HARPER AND JAMES, TORTS 359 (1956) (hereafter cited as HARPER AND JAMES); Youssoupoff v. Metro-Goldwyn-Mayer Pictures, 50 T.L.R. 581, 99 A.L.R. 864 (1934); Contra, Rocky Mountain News Printing Co. v. Fridborn, 46 Colo. 440, 104 P. 956, 24 L.R.A.,N.S., 891 (1909).

11. DeSavitsch v. Patterson, supra note 10; RESTATEMENT, TORTS § 559, Comment d.

12. Curtis Publishing Co. v. Vaughan, 107 U.S.App.D.C. 343, 346, 278 F.2d 23, 26, cert. denied, 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960).

13. Thus the article stressed that plaintiff "like a good many white people" refused to live in the colored neighborhood where his business is located. Plaintiff testified that he lived in that colored neighborhood for five years, and that he moved to Virginia four years ago to get a larger house and not for racial reasons.

The article stated that plaintiff is "attempting to tell colored people just how fast and hard they should run in their race toward racial equality" and "he wants to decide just what kind of colored people we should be."

The testimony of both sides agrees that plaintiff's concern expressed to Mr. Stone was that the headlines were spreading racial hatred and distrust, and stirring up ill feeling between Negroes and white people in the community. Mr. Stone testified that he considered his headlines militant, crusading, forthright, and sociologically oriented, urging faster action in the area of racial equality.

14. RESTATEMENT, TORTS §§ 566, 567; 33 AM.JUR., Libel and Slander, § 9; PROSSER, TORTS § 106, at 759; 1 HARPER AND JAMES § 5.8.

stressed by appellant's counsel, what Mr. Stone's testimony highlights is a defense of privilege based on appellant's own interest in Afro's circulation. Following the June 1961 discussion Mr. Stone wrote an article taking philosophical issue with the position then expressed to him by plaintiff. That article did not mention plaintiff's name or otherwise identify him. The identification and attack came in the fall after the newspaper had been canceled. An effort was made to give this private pecuniary interest of appellant a gloss of public concern with the claim that plaintiff was seeking to interpose himself as a censor and black-out of news. This was barren ground, since the record makes plain that the Afro was available in numerous drugstores within a few blocks of appellant's premises. There is no claim that plaintiff tried to induce others to drop the distribution of Afro.

■ Historically a privilege has been marked out for the person who publishes an alleged libel in the bona fide prosecution of his own interests.[15] The interests protected by this privilege include the protection of one's business.[16] But this is a conditional privilege and the defendant is not protected without regard to the reasonableness of his expression. The privilege is applicable only if the publisher believes the statements to be true, has reasonable grounds for this belief and says no more than reasonably appears to be necessary to protect the interest.[17]

■ Afro's business interest justified putting to its readers the fairness of withdrawal of a newspaper oriented to Negro readership by a dealer doing business in a Negro neighborhood. But that interest did not justify calling him a bigot with a low opinion of the intelligence of his clientele, so as to absolve the defamation even if false.

■ Appellant's loftier claim of privilege invokes the doctrine of privileged criticism, or fair comment, which permits the publication of comment, although defamatory, on the activities and views of another which are matters of "public concern" or "public interest."[18] Definition of the range of matters of public concern or interest is a never-ending task of the law. Certain distinctive subcategories have evolved: e. g., the public acts and qualifications of public officials and candidates; the management of educational, charitable and religious institutions; public offerings of a literary, artistic and scientific nature; public offerings of products for use and consumption.[19] The principle underlying these categories, but extending beyond them, proclaims a general privilege of criticism or comment concerning another's appeal for public support or his participation in public activities.[20]

■ If the person allegedly defamed has made an appeal to the public, the law allows a wide range of comment and expression. We need not concern ourselves here with the question whether, and to what extent, permissible latitude is governed by the "fair comment" doctrine, which embraces statements of opinion or comment, but not false statements of fact,[21] or by the broader doctrine announced by the Supreme Court as to public officials, who cannot recover even for misstatements

---

15. See White v. Nicholls, 44 U.S. (3 How.) 266, 286, 11 L.Ed. 591 (1845) (a case arising in the District of Columbia).

16. PROSSER, TORTS 806; RESTATEMENT, TORTS § 594, Comment on clause (a).

17. PROSSER 806; RESTATEMENT §§ 601, 605.

18. PROSSER § 110, at 812; RESTATEMENT § 606.

19. RESTATEMENT §§ 607–610.

20. RESTATEMENT § 610; PROSSER 814; 1 HARPER AND JAMES 463, citing Kellems v. California CIO Council, 68 F.Supp. 277, 278 (N.D.Cal. 1946), upholding the rule as applied to a woman who "took to the public platform to proclaim her grievances against the government * * * to mould and shape public opinion". See also Brewer v. Hearst Publishing Co., 185 F.2d 846, 850 (7th Cir. 1950).

21. 1 HARPER AND JAMES § 5.28.

of fact in the absence of actual malice.[22] One who enters the public arena must expect latitude in the give-and-take of public debate, extending to sharp and coarse comment, and to excessive and perhaps unwarranted characterization.[23] However, the public interest privilege applicable against one who invites public judgment is no defense to the action brought by plaintiff. He made a personal telephone call to the editor. But he in no sense mounted a public rostrum, not even by a letter expressly or implicitly intended for publication.

The touchstone is not whether the public is interested in plaintiff's views or conduct, for presumptively that applies to everything in a newspaper. "In some sense each person's prejudices involve a matter of importance to the whole community. But so to hold would radically alter the law of libel and too severely limit the class of libels for which redress would lie." See opinion of Judge Washington in support of affirmance, excerpted in the Appendix, which was before us when the petition for rehearing en banc was granted.[24]

The privilege of comment on a product offered to the public is not lost because it incidentally affects the reputation of the producer or distributor.[25] Here, however, there is not an offering by plaintiff to the public, but rather a non-offering of a service. Certainly there could be no merit in a general approach conferring a "public" attribute on situations because of a supposed public interest in the mere fact that an offering or invitation is not extended to the public. Such an approach would violate general understanding and cause the exception to swallow the rule, since non-offerings obviously far exceed offerings.

It would obliterate any reasoned effort to achieve working principles accommodating diverse interests in this field of law.

In limited instances, like a group boycott, non-offerings may take on a public quality giving rise to privileged criticism. Here the plaintiff did not offer to the public his views or reasons for failing to offer the product or service. There is nothing in the record to show that the discontinuance of the paper was presented or appeared to the public as other than a conventional business decision.

The discontinuance by this small retailer was visible to the public in a limited sense, and hence his actions could be depicted without violating his privacy. But his views were not presented to the public, and appellant's defamatory comment concerning those views is not justified either by appellant's private interest, as we have already noted, or by a broader public-interest privilege.

It has been suggested that an expansion of the common law of the public interest privilege is required in the light of New York Times v. Sullivan, and that it protects discussion of all items of public interest, and not merely items concerning public officials. See Note, First Amendment Protection for Good-Faith Defamatory Error, 75 YALE L.J. 642 (1966). If New York Times has application, it would be our duty to do what the Supreme Court did in Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), and accompany the remand with appropriate indication of the proper principles to govern the new trial, and any reassessment of the facts.

---

22. The constitutional guaranty of freedom of discussion of public officials without being subject to suit entails a corollary privilege of making false statements of fact in the absence of malice. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

23. Compare discussion of Sullivan v. Meyer, 67 App.D.C. 228, 91 F.2d 301 (1937), at note 38, infra, and accompanying text.

24. Opinion filed May 27, 1965. Judge Washington's dissent was vacated, along with the opinions of Judges Bazelon and Wright, when rehearing was granted en banc.

25. RESTATEMENT § 610(1).

Undoubtedly *New York Times* is a seminal decision. Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Rosenblatt v. Baer, supra; Linn v. United Plant Guard Workers, 383 U.S. 53, 65, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The line of growth from the *New York Times* taproot seems destined to extend beyond the public official concept. The only extension to private persons that has ever been hinted at by the courts, so far as we are aware, is to the "participant in public debate on an issue of grave public concern." Friendly, J., concurring in Pauling v. News Syndicate Co., 335 F.2d 659, 671 (2d Cir. 1964). Justice Brennan confined Rosenblatt to the issue of public position, as the only issue briefed and argued, and stated (383 U.S. at 86 n. 12, 86 S.Ct. at 676): "We intimate no view whatever whether there are other bases for applying the *New York Times* standards— for example, that in a particular case the interests in reputation are relatively insubstantial, because the subject of discussion has thrust himself into the vortex of the discussion of a question of pressing public concern."

Recently the Eighth Circuit held in Pauling v. Globe-Democrat Publishing Co., 362 F.2d 188, June 21, 1966, that the implications of *New York Times* made it applicable to Professor Pauling, who by "public statements and actions, was projecting himself into the arena of public controversy" and "attempting to influence the resolution of an issue" of importance and controversial nature, and whose prominence placed him in a "position of some influence on the problem's resolution." The court concluded that in regard to freedom of criticism no rational distinction can be drawn between government officials and private citizens seeking "to lead in the determination of national policy." A significant leader, including the head of a pressure group, who "seeks to realize upon his capacity to guide public policy" has no greater immunity from criticism than "his counterpart in public office."

There is no need to reiterate Judge Blackmun's exhaustive review of the cases. We note with interest that after reviewing decisions applying *New York Times* "where a person of prominence involves himself in a matter of great public concern," he adds (362 F.2d at 197):

There are, of course, fact situations where the courts understandably have refused to apply the principle. These include cases where the subject, although perhaps a public figure, did not conduct himself or speak out on a matter of public import [citations], or where the subject was a person prominent only in another country [citations].

■ We conclude that *New York Times*, as written and likely to be extended, does not and will not preclude recovery, even in the absence of malice, by a man whose role is as non-public as plaintiff's, by a man who has not mounted a public rostrum, made an appeal to the public, sought or received public funds, offered a service or product for public use or comment, or organized a boycott or other group activity by members of the public. As Justice Stewart noted, concurring in Rosenblatt at 383 U.S. at 92–93, 86 S.Ct. 669, the constitutional values involved in the law of defamation include not only First Amendment freedoms, but also the right, inherent in the essential dignity and worth of every human being, to protection of reputation.

C

We turn now to the suggestion that even though this case does not permit invocation of the public interest privilege as a complete defense, the public interest in broad discussion of the subject-matter of race relations is significant enough to warrant a protective rule precluding recovery except at the instance of a plaintiff who can show special, pecuniary damage. In effect it is suggested that this court fashion an extension of the ruling in Sweeney v. Patterson, 76 U.S.App.D.C. 23, 128 F.2d 457, cert. denied, 317 U.S. 678, 63 S.Ct. 160, 87 L.Ed. 544 (1942), discussed below.

In the common law of defamation the pecuniary damage requirement was imposed only in the case of oral slander, save for certain exceptions. In the common law of libel damage was said to be "presumed" from the defamation, so that no pecuniary damage need be shown. The distinction has historical roots.

The requirement of pecuniary damages for slander accompanied the gingerly reception of the slander action in the common law courts. In the 13th and 14th centuries actions for defamation were common in the seignorial courts, where the besmirched reputation could be cleared before the very persons who heard it attacked. When these courts decayed, ecclesiastical courts dealt with defamatory utterances as a sin, involving, however, a kind of penance which also provided a clearance of reputation.[26] In the 16th century the common law courts slowly accepted tort actions for slander, but, cognizant of jurisdiction already staked out by the ecclesiastical courts, they held that defamation was only a "spiritual" matter unless "temporal" damage was proved.[27]

This requirement of pecuniary damage, which historically did not preclude vindication of honor in other tribunals, survived notwithstanding the collapse of these tribunals. Apart from certain limited exceptions, it is embedded deep in the law of slander notwithstanding resulting injustice, as appears from prohibition of an action based on emotional distress even when resulting in serious illness.[28] Ameliorative rulings and exceptions serve to cabin yet confirm the rule.[29]

Stricter rules of liability stamped the law of libel, which developed in the 17th century after the emergence of the printing press. In view of the importance of providing a judicial remedy, in order to avoid resort to self-help and resultant breach of the peace, no showing of actual damage was required as a condition of a libel action.[30] This consideration, and others discussed below, seem relevant to our times. The pecuniary damage requirement may be too deeply embedded to pull out of the law of slander, but it should not be injected into the law of libel.

In the case before us the bigotry libel is apt to cause pecuniary damage because the Afro is addressed to Negroes, who are the plaintiff's clientele. But plaintiff need not show any pecuniary damage in order to establish the libel and recover nominal damages, or compensation for nonpecuniary dam-

---

**26.** Van Vechten Veeder, The History and Theory of the Law of Defamation, 3 COLUM.L.REV. 546, 549 (1903).

The usual ecclesiastical penance was an acknowledgment of the baselessness of the imputation, in the vestry room in the presence of the clergyman and church wardens of the parish, and an apology to the person defamed. *Id.* at p. 551. Although the slanderer was corrected for his soul's health (see p. 557), the correction achieved a "clearance" beneficial to the victim.

**27.** PROSSER § 106, at 755. Everything relating to money or business was temporal, as pertaining to matters of this world. Van Vechten Veeder, *supra* note 26, at 561n.

**28.** PROSSER 779; RESTATEMENT § 575, Comment c.

**29.** PROSSER § 107, at 772ff; RESTATEMENT § 575, Comment b, item 5.

**30.** PROSSER 780; RESTATEMENT § 569. See § 568, Comment b, for historical review. The stricter line was first reported in De Libellis Famosis, 5 Co.Rep. 125a, 77 Eng.Rep. 250 (1605), emphasizing that libels deserved punishment as inciting to revenge and tending "to quarrels and breach of the peace."

Star Chamber was particularly concerned with preventing breaches of the peace. Vindication of honor by dueling was outlawed by royal edict of 1613, and Star Chamber decree the following year.

What is significant is not Coke's Star Chamber ruling dispensing with the pecuniary concept, but its retention by the common law courts following the Restoration. The courts had little hesitancy in discarding Star Chamber rulings they disapproved (e.g. the ruling that truth is no defense to a civil action based on a libel inciting to breach of the peace).

age supported by the proof. In Peck v. Tribune Co., 214 U.S. 185, 29 S.Ct. 554, 53 L.Ed. 960 (1909), Justice Holmes rejected incorporation of a special damage requirement into the law of libel. We adhere to the rule that no special, i. e. pecuniary damage is necessary.[31] Nor do we consider that a special damage requirement is interposed even assuming facts extrinsic to the publication are required to establish the libel.[32] The allowance of nominal damages performs a vindicatory function by enabling the plaintiff to brand the defamatory publication as false.[33] The rule that permits satisfaction of the deep-seated need for vindication of honor is not a mere historic relic, but promotes the law's *civilizing function of providing an acceptable substitute for violence in the settlement of disputes.*[34] The judgment also partakes of the nature of relief in equity by subduing, or at least minimizing, the spread of harm to reputation.[35]

Moreover, a special damage requirement would thwart the function of the law in providing compensation for damage that does not take a demonstrable pecuniary form. It is common knowledge that persons who are defamed tend to lose opportunities in fact that they cannot prove at law. The law of libel provides redress in general damages for the impact of the libel on reputation, with mental suffering a recognized element of damage recoverable.[36]

We turn now to Sweeney v. Patterson, *supra,* where this court held that "it is not actionable to publish erroneous and injurious statements of fact * * * regarding the political conduct and views of public officials, so long as no charge of crime, corruption, gross immorality or gross incompetence is made and no special damage results." [37]

---

**31.** This was the rule adopted in § 569 of the RESTATEMENT OF TORTS (1938).

**32.** Some American courts have stated a rule of libel per quod, that where defamation, slander or libel, must be explained by extrinsic facts, special damages must also be pleaded. McCORMICK, DAMAGES § 113 (1935); Eldredge, The Spurious Rule of Libel Per Quod, 79 HARV.L.REV. 733 (1966). These writers consider that rule of libel per quod to be rooted in confusion by the courts of two meanings of "per se." Slander "per se" defines the limited group of slanders actionable without proof of pecuniary damage. This terminology is distinct from the rule that a publication, written or oral, is "actionable per se" when the dafamatory meaning is apparent on its face, and that otherwise an accompanying "innuendo" or explanation is required to establish the defamatory meaning with the aid of extrinsic facts.

Eldredge considers this rule of libel per quod to be a minority rule of the United States courts, and particularly contrary to the trend of decisions since the 1938 appearance of Vol. III of the Restatement. In agreement that the English historical rule is "the weight of authority in this country," see 1 HARPER AND JAMES, TORTS § 5.9, at 373 (1956). A contrary view is taken by Professor Prosser. Prosser, More Libel Per Quod, 79 HARV. L.REV. 1629 (1966).

The American Law Institute has under consideration the possibility of revision of § 569 to limit liability to the case of the publisher who knows or should have known of the extrinsic facts necessary to make the statement defamatory in its innuendo. That modification if adopted would not affect Afro's article on plaintiff, since appellant palpably knows of the facts extrinsic to the publication (e.g. that plaintiff serves a predominately Negro trade) that crystallize the showing of the defamation in this case.

**33.** RESTATEMENT § 569, Comment b.

**34.** "Civil actions for slander and libel developed in early ages as a substitute for the duel and a deterrent to murder. They lie within the genuine orbit of the common law * * *." BRANT, THE BILL OF RIGHTS 502 (1965), quoted by Justice Stewart, concurring in Rosenblatt v. Baer, 383 U.S. 75, 93 n. 4, 86 S.Ct. 669, 680, 15 L.Ed.2d 597 (1966).

**35.** RESTATEMENT § 569, Comment b.

**36.** Washington Times Co. v. Downey, 26 App.D.C. 258, 265 (1905); see Washington Times Co. v. Bonner, 66 App.D.C. 280, 288–289, 86 F.2d 836, 844–845, 110 A.L.R. 393 (1936), quoting from Palmer v. Mahin, 120 F. 737 (8th Cir. 1903); McCORMICK, DAMAGES § 116; RESTATEMENT § 623.

**37.** 76 U.S.App.D.C. at 24, 128 F.2d at 458.

We are not here concerned with the evidentiary significance of pecuniary injury as establishing tendency to harm reputation. Since give-and-take, sharpness and even coarseness have come to be expected concerning those who have entered the lists on appeals to the public, and charges are taken with a grain of salt by all concerned, special damages are relevant to show that reputation was injured, in that a substantial segment of the community took the publication seriously and in a defamatory sense. This is the meaning of Sullivan v. Meyer, 67 App.D.C. 228, 91 F.2d 301 (1937).[38]

The additional substantive requirement of special damage in *Patterson* was in furtherance of freedom of speech and criticism concerning *public officials*. Judge Edgerton's notable opinion was quoted approvingly by the Supreme Court in New York Times v. Sullivan, a decision which precluded liability in the absence of malice. We need not here consider whether the *Sweeney* requirement of special damage should be treated as a half-way house that may now be razed in view of the subsequent *Times* shelter requiring a showing of malice.

The pecuniary damage requirement of *Sweeney* has not been extended in a case of a charge of gross misconduct. Curtis Publishing Co. v. Vaughan, cited *supra*, note 12. And we do not believe it should be extended beyond the case of statements concerning public officials. While society's concern in preventing and redressing attacks upon reputation may be offset "when interests in public discussion are particularly strong," [39] those interests should be protected within the doctrine of public interest privilege. On balance we do not think the public interest privilege should be expanded by permitting libel of a private individual, on the ground of alleged public interest in the news item that defames him, because he is unable to establish pecuniary damage.

### III

Punitive damages were granted by the District Court, which ruled that malice is implied from the fact of publication of a falsehood. At one stage in the evolution of the common law of defamation, the action was not maintainable except upon a showing of wrong motive, i. e., malice. Later, liability was extended even in the absence of intention to defame the plaintiff. A legal fiction was employed; the requirement that malice be pleaded was retained, but malice was said to be presumed from the fact of publication. This language is misleading; what is really meant is that malice is not required for the basic defamation action.[40] Due to a misunderstanding of the fiction of implied malice some courts have ruled it sufficient as a basis for award of exemplary or punitive damages.[41] We do not agree.

The proper award of punitive damages in certain common law torts, including libel, is dependent on a determination of actual malice or wanton conduct. Day v. Woodworth, 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851). Since that standard was not here followed—and there was no determination of either actual malice or wanton conduct—we are bound to remand. Should appropriate findings sustain an application of the proper standard, the trial judge will take into account the elements upon which his award must be based. We turn to that aspect of our problem.

In Day v. Woodworth, *supra*, the propriety of punitive damages was drawn into question, but was considered too

38. In Sullivan v. Meyer, the court dismissed the complaint on the ground that the article would not lead a substantial number of neighbors to view plaintiff with contempt and was therefore not actionable without proof of "special damage."

39. Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966).

40. The rulings are cited and analyzed in McCormick, Damages § 79, at 281 (1935).

41. Prosser, Torts 790ff; McCormick, Damages § 79 (1935).

established to overturn. Since these damages are provided "to punish a wrongdoer and deter others from the commission of a like wrong",[42] they have been attacked as inserting a criminal element into the civil law,[43] but on a lesser standard of proof. Though the doctrine has continued to be questioned, it has continued to be applied.[44]

Yet there is need to be concerned about the problem of excessive punitive damages, for this prospect portends a potentially more chilling restraint on appropriate latitude in news discussion than ensues from actions for compensatory damages. This danger is accentuated by opinions quoting and applying the observation in Day v. Woodworth, *supra*, 54 U.S. at 371, that these damages are provided because "the wrong done to the plaintiff is incapable of being measured by a money standard" and that the infliction of "smart money * * * by way of punishment or example * * * has always been left to the discretion of the jury as the degree * * * must depend on the peculiar circumstances of each case." The discretion of the jury is enhanced by the doctrine that punitive damages need not have any necessary relation to compensatory damages. Wardman-Justice Motors v. Petrie, 59 App.D.C. 262, 39 F.2d 512, 69 A.L.R. 648 (1930). We have no occasion in this case to consider whether proof of compensatory (not necessarily pecuniary) damages should be a prerequisite for punitive damages under the District common law in view of the insertion of such a requirement in Linn v. United Plant Guard Workers, *supra*, 383 U.S. at 66, 86 S.Ct. 657.

Nevertheless, a court has undoubted power to reduce jury damages through a remittitur, Dimick v. Schiedt, 293 U.S. 474, 485, 55 S.Ct. 296, 79 L.Ed. 603 (1935). The court may set aside an award of punitive damages deemed to be excessive or against the weight of the evidence,[45] or larger in amount than the court thinks it justly ought to be.[46] The trial court has a greater role than the court on appeal but we may note that its function may encompass a duty, and not merely an opportunity, to avoid excessive damages by remittitur or new trial. Linn v. United Plant Guard Workers, *supra*, 383 U.S. at 65–66, 86 S.Ct. 657.

Consideration of whether punitive damages are excessive naturally brings up the question as to what elements may properly be taken into account in their assessment. One factor mentioned by the Supreme Court, as a guide rather than a definition, is the provision of costs of litigation actually incurred but not included within costs taxable to the ordinary victor, Day v. Woodworth, *supra*, 54 U.S. at 371. The significant element of course is counsel fees.[47] In another case there may be room for adaptation of the familiar principle whereby one who profits from the use of another's property (here, abuse of

---

42. Press Publishing Co. v. Monroe, 73 F. 196, 201 (2d Cir. 1896). However, exemplary damages are not so steeped in penal character as to be inapplicable to wrongs committed outside the jurisdiction. Edwards v. Hines, 85 F.Supp. 724 (D.D. C.1948), affirmed per curiam, 85 U.S.App. D.C. 419, 174 F.2d 670 (1949).

43. McCormick, Damages § 77 (1935).

44. Milwaukee & St. Paul Ry. Co. v. Arms, 91 U.S. 489, 493, 23 L.Ed. 374 (1876); Wardman-Justice Motors v. Petrie, 59 App.D.C. 262, 265, 39 F.2d 512, 515 (1930).

45. Bradley Min. Co. v. Boice, 194 F.2d 80 (9th Cir. 1951), cert. denied, 343 U.S. 941, 72 S.Ct. 1033, 96 L.Ed. 1347 (1952), rehearing en banc denied, 198 F.2d 790 (9th Cir. 1952), remanded for further proceedings, 345 U.S. 932, 73 S.Ct. 797, 97 L.Ed. 1361 (1953), rehearing denied 205 F.2d 937 (9th Cir. 1953), cert. denied, 346 U.S. 874, 74 S.Ct. 125, 98 L.Ed. 382 (1953).

46. Sunray Oil Corp. v. Allbritton, 188 F.2d 751 (5th Cir. 1951).

47. Even where that amount is not proved the jury may be instructed to take probable expense into account. See Brewer, J., in Titus v. Corkins, 21 Kan. 722 (1879).

his reputation) may be called upon to account for those profits. As to the basic purposes of deterrence and punishment, they are also the objective of the criminal libel law.[48] In the District of Columbia the penalty prescribed by the legislature for the extreme case of criminal libel is $1,000 fine plus five years imprisonment. D.C.Code, § 22–2301.[49] The money equivalent for a prison term presents a subject for reflection.

We need not pursue this subject in the present case, for even assuming, without suggesting, that the District Court will conclude on remand that an award for exemplary damages is proper, the award of $2,000 previously made in this case is not so large as to require us to grapple with the problem of outer limits. We could not in this case find such an award excessive, or larger than should be condoned in simple justice, in view of the probable cost of litigation and even a modest provision for deterrence. We say this, however, not in derogation but in contemplation of the authority and duty of courts to reduce verdicts when they are excessive. Our express reiteration of that authority should help assure that the protection of individual reputation maintained by our decision does not carry overhanging punitive prospects excessively restrictive of freedom of press and comment.

 The award of $500 compensatory damages is affirmed. The award of $2,000 punitive damages is reversed and remanded to the District Court for further proceedings not inconsistent with this opinion.

It is so ordered.

## APPENDIX

Excerpts from opinion of Circuit Judge Washington, dissenting from the May 27, 1965 opinions and judgment of the division of the court (Chief Judge Bazelon and Circuit Judge Wright), which were vacated upon entry of the order granting rehearing en banc.

———————

* * * In my view Jaffe's views are not of such concern to the public that they can be publicly misstated and widely circulated without recourse. Nor would I extend the *Sweeney* doctrine, making recovery contingent upon proof of special damages, beyond its existing limit—the criticism of public figures.

Addressing himself to the conditional privilege for comments on matters of public interest, Prosser states:

"The [public interest] privilege is limited * * * to those matters which are of legitimate concern to the community as a whole *because they materially affect the interests of all the community.*" PROSSER, TORTS 812 (3d ed. 1964). (Emphasis added.)

Whether or not a particular transaction can be said materially to affect the whole community can be a difficult question. In the instant case the parties differ sharply in their characterization of the subject matter of the article. Judge Bazelon seems to concur in the judgment of Mr. Stone, the publisher of the Afro-American and author of the article, that the "subject of that article is the total relationship of whites and Negroes in America." Mr. Jaffe urges that the subject is a small druggist "cancelling his subscription to a newspaper." Neither description is inaccurate. For purposes of defining the scope of the "public interest" privilege, however, I think the latter view is preferable.

Under Stone's view of the matter, it would seem that the privilege would pro-

---

48. However, the offender is subject to both punitive damages and criminal punishment without being in double jeopardy. Moreover, the fact that defendant has paid or is subject to a fine is not to be taken in reduction of punitive damages. McCORMICK, DAMAGES § 77 (1935).

49. Raymond v. United States, 25 App.D.C. 555, 560 (1905): "Imprisonment in the penitentiary for five years is not in itself a cruel and unusual punishment in the sense of the constitutional prohibition; and the publication of a libel is an offense which might be, under some circumstances, especially atrocious and deserving of severe punishment."

tect libelous comment on the supposed bigotry of almost any person. We note that appellant does not assert the defense of truth. Its brief states that the statement that appellee appears to be a bigot "is neither false nor demonstrably true." In some sense each person's prejudices involve a matter of importance to the whole community. But so to hold would radically alter the law of libel and too severely limit the class of libels for which redress would lie. Setting the limits on the public interest exception more narrowly would not have a significant inhibiting effect on public debate. Prosser suggests a limitation on the privilege when he notes with approval that comment on the disloyalty of a single individual has been held not to be within the privilege, but comment on an organized "Peace Now" movement in wartime was held within it. This suggests a common-sense limitation on the scope of the privilege.

\* \* \*

I think that the article attacking Jaffe falls outside the area of comment on matters of public interest. Important as it is to keep the editors of newspapers free to publish their commentaries on public affairs and the conduct of public officials, the right of private individuals to shield their private discussions and private opinions from general disclosure and criticism is also to be considered.

WASHINGTON, Senior Circuit Judge, concurs in the affirmance of the judgment awarding compensatory damages to appellee, for the reasons stated in his opinion filed May 27, 1965. He did not participate in the decision of the question whether to reverse the portion of the judgment of the District Court which awards punitive damages to appellee.

BAZELON, Chief Judge (dissenting).

The court is called upon to reconcile two interests of critical importance, freedom of discussion and protection against defamation. In my view, this end is best served here by applying the rule that "erroneous and injurious statements of fact and injurious comment or opinion" regarding a matter of public interest are not actionable libel unless "special damage results." Sweeney v. Patterson, 76 U.S.App.D.C. 23, 24, 128 F.2d 457, 458, cert. denied, 317 U.S. 678, 63 S.Ct. 160, 87 L.Ed. 544 (1942).[1] Without such damage, the existence of "malice" whether presumed or "actual" or a finding that the article was libel "per se"[2] should not establish liability. Moreover, "in view of the propensity of juries to award excessive damages for defamation,"[3] spe-

---

1. This court stated in *Sweeney:*

"Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. Information and discussion will be discouraged, and the public interest in public knowledge of important facts will be poorly defended, if error subjects its author to a libel suit without even a showing of economic loss. Whatever is added to the field of libel is taken from the field of free debate." 76 U.S.App.D.C. at 24, 128 F.2d at 458.

That *Sweeney* is not restricted to criticism of public officials appears from its reliance on the earlier case of Sullivan v. Meyer, 67 U.S.App.D.C. 228, 91 F.2d 301 (1937) involving newspaper criticism of a private citizen relating "exclusively to [his] attitude towards a question of public interest." *Sullivan* was read to require special damage for liability for such criticism. 76 U.S.App.D.C. at 25, 128 F. 2d at 459.

In some cases an exception to this rule allows recovery for a false imputation of *gross* misconduct without special damage, Afro-American Publishing Co. v. Rudbeck, 101 U.S.App.D.C. 333, 248 F.2d 655 (1957); Pittsburgh Courier Publishing Co. v. Lubore, 91 U.S.App.D.C. 311, 200 F.2d 355 (1952); Hughes v. Washington Daily News Co., 90 U.S.App.D.C. 155, 193 F.2d 922 (1952); Curtis Publishing Co. v. Vaughan, 107 U.S.App.D.C. 343, 278 F.2d 23 (1960). Such charges are not, however, involved in this case. Moreover, this exception should be narrowly restricted to those cases where the extreme character of the alleged libel indicates that some damage must have resulted even though the plaintiff is not able directly to prove it. See PROSSER, LAW OF TORTS § 107 at 783 (3d ed. 1964).

2. See PROSSER, *op. cit. supra,* § 107 at 782.

3. Linn v. Plant Guard Workers, 383 U.S. 53, 64, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966).

cial damage should be not only a prerequisite to actionable libel, but also a limitation on the amount recoverable.

In addition to the facts described in the court's opinion, I rely on the testimony of the article's author, Mr. Stone, as to how the subject matter appeared to him:

> The subject of that article is the total relationship of white and Negroes in America. * * * this is a specific instance in which a white man * * * holding a business in a Negro community, deriving a major share of his income from Negroes, is he himself determining how fast or how militant Negroes should be. He is making this determination by his expression of our headlines and refusing to take the paper based upon his dislike of our headlines, which he regarded as too militant or too aggressive or not to his taste. That is the subject of that article and I thought [it] was of very vital concern to Negroes and whites everywhere.

Appellee denies that his refusal to sell appellant's newspaper involves a question of public interest. He says that "the general public [had no] legitimate interest whatsoever in the matter of Eli Jaffe, the proprietor of a small neighborhood drug store, cancelling his subscription to a newspaper" and that his action was a "private matter." But the existence of a public interest question depends "upon the facts as they *reasonably* appear to the person whose liability is in question." [4] Personal and narrow commercial interests may in part have motivated Stone's criticism of Jaffe. But the dispute between Jaffe and the newspaper is so overladen with questions of pressing contemporary importance that I am unwilling to say Stone could not reasonably believe, as he testified, that Jaffe's actions raised an issue of public interest.

In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court held that criticism of public officials, containing misstatements of fact, was not actionable libel unless "the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–280, 84 S.Ct. at 726. If this rule were to be extended to the present case, appellee would be required to show not only special damage, under Sweeney v. Patterson, *supra*, but also "actual malice." I would not apply the *New York Times* rule here. Although the same policies which support free criticism of public officials also support free discussion of publicly significant issues, private citizens, who like Mr. Jaffe, become embroiled in public controversy may, in some circumstances, warrant greater protection from injurious and false defamation than public officials. I find this protection in requiring such individuals to show only special damage.

The requirement of special damage is not satisfied by the emotional distress alleged here.[5] Otherwise freedom of

4. Watwood v. Stone's Mercantile Agency, 90 U.S.App.D.C. 156, 158, 194 F.2d 160, 161, 30 A.L.R.2d 772, cert. denied, 344 U.S. 821, 73 S.Ct. 18, 97 L.Ed. 639 (1952) (emphasis supplied), which held that a credit agency could provide information to a subscriber, without forfeiting its qualified privilege regarding libel liability, if it reasonably believed that the subscriber requested the information for a business purpose. The privilege's purpose there was to foster the commercial "benefits that [credit agency] subscribers derive from frank reports." *Ibid.* To forfeit the privilege in a particular case on the ground that no commercial benefits would actually be realized by the report, even though the credit agency reasonably believed such benefits would result, would too greatly inhibit the agency generally from giving frank information and would thus defeat the purpose of the privilege. Similarly, a narrow construction of the existence of a public interest question—based, for example, exclusively on the view of the person criticized—would unduly inhibit public discussion and thus defeat the purpose of the rule requiring special damages to support liability.

5. This requirement recognizes that, despite the strong need to encourage and protect free discussion of public issues, there may

public discussion would be unduly impaired. I would therefore direct judgment in appellee's favor.

WRIGHT, Circuit Judge, with whom FAHY, Circuit Judge, concurs (dissenting).

Since this case was tried and decided before the Supreme Court's decision in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), I would remand it for retrial and reconsideration in the light of that case, compare Pauling v. National Review, Inc., 49 Misc.2d 975, 269 N.Y.S.2d 11 (1966), and its possible effect on the traditional fair comment rule. See Note, *The Scope of First Amendment Protection for Good-Faith Defamatory Error*, 75 YALE L.J. 642 (1966).

Wilbur K. Miller, Senior Circuit Judge, dissented.

be a remedy for "really serious injury and loss [caused] by false and unfair statements." Sweeney v. Schenectady Union Pub. Co., 122 F.2d 288, 292 (2d Cir. 1941) (dissenting opinion), *affirmed by an equally divided Court*, 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942). Judge Clark, dissenting, urged the rule later enunciated in this jurisdiction by Sweeney v. Patterson, supra. The Second Circuit's majority opinion in the *Schenectady Union Pub. Co.* case rested on its interpretation of New York law, and the Supreme Court's affirmance did not establish a federal law of libel. But that affirmance must now be read in the light of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).